WELCH, J.
IgThe plaintiffs, Frances Robertson, Phillis Castille, Leslie Robertson, and Stewart Robertson, appeal a judgment that granted summary judgment in favor of defendant, The Sherwin-Williams Company (“Sherwin-Williams”) and dismissed their survival and wrongful death claims against Sherwin-Williams and a judgment rendered following a “Daubert hearing”[2] that prohibited certain testimony from the plaintiffs’ expert on causation, Dr. Eugene J. Mark. For reasons that follow, we reverse both judgments of the trial court and remand for further proceedings.[3]
I. FACTUAL AND PROCEDURAL HISTORY
The factual and procedural history of the current dispute is so closely intertwined with our earlier opinion involving essentially the same issues, Robertson v. Doug Ashy Bldg. Materials, Inc., 2010-1552 (La.App. 1st Cir.10/4/11), 77 So.3d 339, writs denied, 2011-2468, 2011-2430 (La.1/13/12), 77 So.3d 972, 973, writs not considered, 2011-2433, 2011-2432 (La.1/13/12), 77 So.3d 973, 974 (“Robertson III ”[4]), that it is necessary to set forth in detail the relevant factual, procedural, and legal history from our earlier opinion prior to setting forth the factual and procedural history of the present appeal.
IüA. Robertson III, 77 So.3d at 342-345 (footnotes renumbered):
On June 30, 2004, Harris Robertson was diagnosed with mesothelomia and on November 27, 2004, he died from the disease. On May 26, 2005, the plaintiffs, Harris Robertson’s wife and children, filed this lawsuit against a host of defendants that they claimed were responsible for manufacturing, supplying, selling, or exposing Harris Robertson to asbestos-containing products, including but not limited to Georgia-Pacific Corporation (“Georgia-Pacific”)![5]], Union Carbide Corporation (“Union Carbide”) and Sherwin-Williams.![6]] Essentially, the *560 plaintiffs alleged that Georgia-Pacific manufactured and sold asbestos-containing products, that Union Carbide sold, distributed, and supplied raw asbestos, and that Sherwin-Williams was a supplier or distributor of asbestos-containing products.
In the plaintiffs’ petition, they alleged that Harris Robertson’s fatal disease was caused in part by his exposure to asbestos and asbestos-containing products through his work for V.P. Pierret Construction Company from approximately 1960-1970. Specifically, the plaintiffs asserted that during this time frame, Harris Robertson installed sheet-rock and was regularly exposed to friable asbestos and asbestos-containing products, which were present in the joint compounds used to finish or float the sheetrock, and as a result of that exposure, asbestos dust and fibers were inhaled or otherwise ingested by Harris Robertson.[7]
On October 8, 2008, Sherwin-Williams filed a motion for summary judgment, asserting that plaintiffs had “no evidence” that Harris Robertson “had any, much less substantial, asbestos exposure from products bought at ‘Sherwin-Williams’ stores, or indeed that [Sher-win-Williams] owned the stores in question.” Thereafter, the ^plaintiffs filed ... a response to Sherwin-Williams’ motion for summary judgment.
.... In response to Sherwin-Williams’ motion for summary judgment, the plaintiffs contended that there were genuine issues of material fact as to whether Harris Robertson was exposed to significant amounts of asbestos as a result of the asbestos containing joint compound sold or distributed by Sherwin-Williams.
Additionally, on December 18, 2009, Sherwin-Williams filed a motion to strike portions of the opinion of the plaintiffs’ expert, Dr. Mark, a practicing pathologist and a Harvard Medical School professor of pathology. Specifically, Sherwin-Williams sought an order precluding Dr. Mark from offering what it claimed to be “unreliable testimony that ‘any fiber’ or ‘every exposure above background’ was a substantial contributing factor” in causing Harris Robertson’s mesothelioma.
The plaintiffs opposed the motion to strike, essentially arguing Dr. Mark had not opined that “any fiber” or “every exposure above background” was a substantial contributing factor in causing Harris Robertson’s mesothelioma, as suggested by Sherwin-Williams, and that Dr. Mark’s testimony and conclusions regarding the cause of Harris Robertson’s mesothelioma had been made using valid methodology and was supported by, and consistent with, generally-accepted scientific and medical literature.
After a hearing on January 19, 2010, the trial court denied Sherwin-Williams’ motion for summary judgment and *561 granted Sherwin-Williams’ motion to strike![8]] On February 2, 2010, the trial court signed a judgment denying Sher-win-Williams’ motion for summary judgment! [9]] ^d on February 28, 2010, the trial court signed a judgment granting Sherwin-Williams’ motion to strike.
On January 25, 2010, Sherwin-Williams filed a motion for new trial on the denial of its motion for summary judgment, contending that it was entitled, under La. C.C.P. art.l973[,] to a new trial because the “plaintiffs cannot establish that any asbestos exposure for which Sherwin-Williams is responsible was a substantial contributing factor in causing” Harris Robertson’s mesothelio-ma. Specifically, Sherwin-Williams argued that after the trial court denied its motion for summary judgment, the trial court granted Sherwin-Williams’ motion to strike portions of the testimony of Dr. Mark, and without Dr. ^Mark’s opinion on specific or medical causation, the plaintiffs had no other expert testimony establishing specific or medical causation, ie., that the alleged asbestos exposure from products purchased at Sherwin-Williams was a substantial contributing factor in causing Harris Robertson’s mesothelioma.
Additionally, on February 19, 2010, the plaintiffs filed a motion for new trial on the grant of Sherwin-Williams’ motion to strike portions of the opinion of Dr. Mark[10] At a hearing on March 2, 2010, the trial court denied the plaintiffs’ motion for new trial on the motion to strike, granted Sherwin-Williams’ motion for new trial on its motion for summary judgment, and granted Sherwin-Williams’ motion for summary judgment “regarding substantial contributing cause,” thereby dismissing the plaintiffs’ claims against Sherwin-Williams! [11]
On April 6, 2010, the trial court signed a judgment denying the plaintiffs’ motion for new trial on the motion to strike, granting Sherwin-Williams’ motion for new trial on its motion for summary judgment, and granting Sherwin-Williams’ motion for summary judgment “regarding substantial contributing cause,” and on April 5, 2011, the trial court signed a supplemental judgment, which in addition to containing the provisions set forth in the April 6, 2010 judgment, also dismissed the plaintiffs’ claims against Sherwin-Williams with prejudice![12]]
*562 The plaintiffs ... appealed the April 5, 2011 judgment granting Sherwin-Williams’ motion for new trial on its motion for summary judgment and granting Sherwin-Williams’ motion for summary judgment, the February 23, 2010 judgment granting Sherwin-Williams’ motion to strike the testimony of Dr. Mark, and the April 6, 2010 judgment denying their motion for new trial on Sherwin-Williams’ motion to striked[13]]
IfiOn appeal, this court reversed both the February 23, 2010 and April 5, 2011 judgments of the trial court.[14] Robertson III, 77 So.3d at 352 and 359-360. In reversing the April 5, 2011 judgment granting Sher-win-Williams’ motion for new trial on its motion for summary judgment and granting the motion for summary judgment, this court initially noted that the trial court erred in granting summary judgment on the issue of “substantial cause” (ie., whether the exposure to asbestos-containing products purchased at or sold by Sher-win-Williams was a substantial factor in bringing about Harris Robertson’s meso-thelioma) because that issue was not raised in the underlying motion for summary judgment.[15] Robertson III, 77 So.3d at 349; see also La. C.C.P. art. 966(E). On de novo review of the issue actually raised by Sherwin-Williams in its motion summary judgment (ie., whether Harris Robertson had substantial asbestos exposure from products bought at Sherwin-Williams’ stores or that Sherwin-Williams owned the stores in question), this court determined that the plaintiffs put forth sufficient evidence establishing that there were genuine issues of material fact as to *563 whether “Gold Bond” was an asbestos containing joint compound, whether Harris Robertson routinely and regularly used and inhaled (and was thus significantly exposed to) the asbestos-containing “Gold Bond” joint compound in his dry wall finishing |7work, and whether Harris Robertson (or other people with whom he worked) purchased the asbestos-containing joint compound “Gold Bond” from Sher-win-Williams’ stores. Robertson III, 77 So.3d at 349-352. Accordingly, this court determined that Sherwin-Williams was not entitled to summary judgment or to a new trial on its motion for summary judgment. Id.
With respect to the February 23, 2010 judgment granting Sherwin-Williams’ motion to strike the testimony of Dr. Mark, this court determined that the trial court, when it concluded that Dr. Mark’s expert opinion was unreliable, failed to comply with La. C.C.P. art. 1425(F) and failed to evaluate or analyze Dr. Mark’s expert opinion under the standards set forth by the Unites States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116 (1993). Robertson III, 77 So.3d at 358-359. Finding that this constituted legal error by the trial court, this court conducted a de novo review of Dr. Mark’s expert opinion on causation and concluded that Sherwin-Williams failed to meet its burden of proving that Dr. Mark’s expert opinions with regard to causation were unreliable. Id. Thus, the trial court erred in granting Sherwin-Williams’ motion to strike. Robertson III, 77 So.3d at 359.
After reversing both the February 23, 2010 judgment of the trial court granting Sherwin-Williams’ motion to strike the testimony of Dr. Mark and the April 5, 2011 judgment of the trial court granting Sherwin-Williams’ motion for new trial and granting Sherwin-Williams’ motion for summary judgment, this court remanded the matter to the trial court for further proceedings. Robertson III, 77 So.3d at 359-360.
| SB. Proceedings on Remand and the Present Appeal
On remand, Sherwin-Williams and the other defendants, Georgia Pacific and Union Carbide, filed a motion for a Daubert hearing on Sherwin-Williams’ motion to strike portions of the opinion of Dr. Mark. Although the plaintiffs objected to another Daubert hearing on the basis it was unnecessary given this Court’s decision in Robertson III, after a hearing, the trial court granted the motion.[16] Thereafter, the trial court then conducted an evidentiary Dau-bert hearing, and at the conclusion of the hearing, the trial court rendered judgment granting the motion in part and denying the motion in part. On August 21, 2012, the trial court signed a “Daubert order” (or judgment) in accordance with its oral reasons, specifically providing that Dr. Mark was prohibited from testifying that each “special exposure” to asbestos constituted a significant contributing factor in the development of the disease, that Dr. Mark was prohibited from giving his definition of “special exposure,” but otherwise, that Dr. Mark was allowed to give causation opinions.
Thereafter, on December 5, 2012, Sher-win-Williams filed a motion for summary judgment claiming “that [the] [pjlaintiffs have no evidence capable of sustaining their burden of proving that asbestos from *564 products purchased at Sherwin-fWilliams’] stores was a substantial contributing factor in causing Harris Robertson’s mesothelio-ma.” The plaintiffs opposed the motion, and following a hearing on January 8, 2013, the trial court granted Sherwin-Williams’ motion for summary judgment. A written judgment in accordance with the trial court’s ruling granting Sherwin-Williams’ motion for summary judgment and dismissing the plaintiffs’ claims against Sherwin-Williams with prejudice was signed on January 29,2013.
l9The plaintiffs now appeal the January 29, 2013 judgment dismissing its claims against Sherwin-Williams, as well as the August 21, 2012 interlocutory judgment (or Dauberb order) limiting the testimony of Dr. Mark.[17] On appeal, the plaintiffs contend that the trial court: (1) abused its discretion in partially granting Sherwin-Williams’ Dauberb motion and (2) erred in granting Sherwin-Williams’ motion for summary judgment and in failing to recognize the existence of genuine issues of material fact. -
II. LAW AND DISCUSSION

A. Cause-Lu-Facb in a Mesothelioma Case

The issues raised in the previous appeals in this matter, Robertson I, Robertson II, Robertson III, and in thé instant appeal, Robertson IV, and its companion appeals, Robertson V and Robertson VI, have essentially involved the plaintiffs’ burden of proving the cause-in-fact element of their action for damages.[18] Cause-in-faet is a question of fact. Robertson III, 77 So.3d at 347; Rando, 16 So.3d at 1087.
There is a universally recognized causal connection between asbestos exposure above background levels and the occurrence of mesothelioma. Robertson III, 77 So.2d at 349, n. 14; Robertson I, 77 So.3d at 335; see also Landry v. Avondale Industries, Inc., 2012-0950 (La.App. 4th Cir.3/6/13), 111 So.3d 508, 511. Brief exposures to asbestos may cause mesothelio-ma in persons |indecades later and every non-trivial exposure to asbestos contributes and constitutes a cause of mesothelio-ma. See Rando, 16 So.3d at 1091; Robertson I, 77 So.3d at 335; Landry, 111 So.3d at 511; Francis v. Union Carbide Corp., 2012-1397 (La.App. 4th Cir. 5/8/13), 116 So.3d 858, 862, wrib denied, 2013-1321 (La.9/20/13), 123 So.3d 177. The causal link between asbestos exposure and meso-thelioma contraction has been demonstrated to such a high degree of probability, while at the same time, few if any other possible causes have been identified, that if one is diagnosed as having mesothelioma and that person was exposed to asbestos, that exposure is recognized to be the cause *565 of the mesothelioma. Robertson I, 77 So.3d at 335-386.
However, due to the lengthy latency period between exposure to asbestos and manifestation of the asbestos-related disease, cause-in-fact of the plaintiffs injuries by a particular defendant is considered the “premier hurdle” faced by plaintiffs in asbestos litigation. Robertson III, 77 So.3d at 347; Rando, 16 So.3d at 1088. To prevail in an asbestos case, the plaintiff must show by a preponderance of the evidence, that he was exposed to asbestos and that he received an injury substantially caused by that exposure. Robertson III, 77 So.3d at 347; Rando, 16 So.3d at 1088. When multiple causes of injury are present, a defendant’s conduct is a cause-in-fact if it is a substantial factor in generating plaintiffs harm. Robertson III, 77 So.3d at 347; Rando, 16 So.3d at 1088.
Mesothelioma can develop after fairly short exposures to asbestos. Rando, 16 So.3d at 1091. Simply because a plaintiff suffered asbestos exposure while working only a short period for an employer and had longer exposures while working for others, it cannot be said the relatively short asbestos exposure was not a substantial factor in causing his mesothelioma. Id.
In Robertson III, 77 So.3d at 347, this court noted that the Louisiana Supreme Court addressed the causation problem in asbestos-related disease cases Inin Rando, 16 So.3d at 1090-1091, by relying on the reasoning of Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1094 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), an asbestosis case, which provided as follows:
[I]t is impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust resulted in injury to Borel. It is undisputed, however, that Borel contracted asbestosis from inhaling asbestos dust and that he was exposed to the products of all of the defendants on many occasions. It was also established that the effect of exposure to asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury. We think, therefore, that on the basis of strong circumstantial evidence!,] the jury could find that each defendant was the cause in fact of some injury to Borel.
The Borel court also stated that “[wjhether the defendant’s conduct was a substantial factor is a question for the jury, unless the court determines that reasonable men could not differ.” Id.
In Rando, the Supreme Court then noted, that “[bjuilding upon this early observation [in Borel}, Louisiana courts have employed a ‘substantial factor’ test to determine whether exposure to a particular asbestos-containing product was a cause-in-fact of a plaintiffs asbestos-related disease.” Rando, 16 So.3d at 1091. Thus, in an asbestos case, the claimant must show he had significant exposure to the product complained of to the extent that it was a substantial factor in bringing about his injury. Robertson III, 77 So.3d at 347 and 359; Rando, 16 So.3d at 1091. Stated differently, the plaintiff must prove, by a preponderance of the evidence that: (1) his exposure to the defendant’s asbestos product was significant, and (2) that this exposure caused or was a substantial factor in bringing about his mesothelioma (or other asbestos-related disease). Robertson III, 77 So.3d at 347-348; see also Rando, 16 So.3d at 1092. In meeting this burden of proof, the plaintiff is not required to prove the quantitative level of exposure, i.e., the exact or cumulative dose of asbestos or the concentration of asbestos to which the plaintiff l^was exposed *566 (vis-á-vis air sampling or similar means). See Robertson III, 77 So.3d at 359 and Rando, 16 So.3d at 1090-1091. Rather, a qualitative evaluation of the exposures to asbestos, ie., the level, frequency, nature, proximity, and duration of the exposures at issue, can sufficiently prove causation. See Rando, 16 So.3d at 1090-1092; Watts v. Georgia-Pacific Corp., 2012-0620 (La. App. 1st Cir.9/16/13), 135 So.3d 53, 62, writ denied, 2013-2442 and 2013-2444 (La. 1/27/14), 131 So.3d 59.[19] Thus, the plaintiff can meet his burden of proving causation through either a quantitative or a qualitative assessment of asbestos exposure.

B. Cause-In-Fact in the Present Case

In this case, with regard to cause-in-fact of the plaintiffs’ injuries (by Sher-win-Williams), the plaintiffs will bear the burden of proving that: (1) Harris Robertson had substantial asbestos exposure from products bought at Sherwin-Williams, and (2) that Harris Robertson’s exposure to asbestos containing products manufactured or sold by Sherwin-Williams was a substantial factor in bringing about or causing his mesothelioma. Robertson III, 77 So.3d at 352. The issues raised in this appeal concern the second prong of cause-in fact of the plaintiffs’ injuries— whether Harris Robertson’s exposure to asbestos-containing products manufactured or sold by the defendants was a substantial factor in bringing about or causing his mesothelioma.[20] Specifically to be determined is whether the 11stestimony of Dr. Mark, the plaintiffs’ expert on this issue, was reliable under the standards set forth in Daubert and whether summary judgment on this issue was appropriate.
1. Sherwin-Williams’ Motion to Strike and the Daubert Hearing
In Robertson III, 77 So.3d at 349 n. 14 and 352-353, we noted that the plaintiffs in this matter were relying on the expert opinion of Dr. Mark to establish that Harris Robertson’s significant exposure to 'asbestos-containing joint compounds manufactured or sold by the defendants, including Sherwin-Williams, was a substantial factor in bringing about or causing his mesothelioma — in other words, that Harris Robertson’s asbestos exposures were medically significant. See also Robertson I, 77 So.3d at 336. Dr. Mark, a 1967 Harvard Medical School graduate, is employed as a pathologist in the Department of Pathology at Massachusetts General Hospital and practices primarily in pulmonary and autopsy pathology. Robertson III, 77 So.3d at 353. Dr. Mark is also a professor at Harvard Medical School, and he serves as a co-director of several postgraduate courses relating to pathology and asbestos-related lung diseases. Id.
In Sherwin-Williams’ earlier motion to strike, it sought an order precluding Dr. *567 Mark from offering unreliable testimony that “any fiber” or “every exposure above background” was a substantial contributing factor in causing Harris Robertson’s disease, and the trial court initially granted the motion, finding that Dr. Mark’s opinions on causation in this case were unreliable. Robertson III, 77 So.3d at 353. In Daubert, the United States Supreme Court set forth the criteria for determining the reliability of expert scientific testimony. The United States Supreme Court found that when, “[f]aced with a proffer of expert scientific testimony, ... the trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist thektrier of fact to understand or determine a fact in issue.” Daubert, 509 U.S. at 592, 113 S.Ct. at |142796. The Supreme Court explained that this would entail a “preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.” Daubert, 509 U.S. at 592-593, 113 S.Ct. at 2796. The Supreme Court then enumerated factors that the trial court may consider in fulfilling this “gatekeeping role:” the testability or refutability of the expert’s theory or technique; whether the technique has been subjected to peer review and/or publication; the known or potential rate of error; and whether the technique or methodology is generally accepted by the scientific community. See Daubert, 509 U.S. at 593-594, 113 S.Ct. at 2796-2797. This list of factors is meant to be helpful, not definitive. Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 151, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999).[21]
The factual basis for an expert’s opinion determines the reliability of the testimony. An unsupported opinion can offer no assistance to the fact finder and should not be admitted as expert testimony. Robertson III, 77 So.3d at 355. The trial court’s inquiry must be tied to the specific facts of the particular case. Id. The abuse of discretion standard applies to the trial court’s ultimate conclusion as to whether to exclude expert witness testimony and to the court’s decision as to how to determine reliability. Id.
It is important to note, however, that there is a crucial difference between questioning the methodology employed by an expert witness and questioning the application of that methodology or the ultimate conclusions derived from that application. Only a question of the validity of the methodology employed brings \ ^¡Daubert into play. Id. Additionally, Daubert concerns admissibility of the expert’s opinion and not his qualifications as an expert in the area tendered. Id.
Louisiana Code of Civil Procedure article 1425(F) sets outs exactly what is required from the parties and the court when conducting a Daubert hearing and ruling on the admissibility of an expert’s testimony, and provides, in pertinent part as follows:
F. (1) Any party may file a motion for a pretrial hearing to determine whether a witness qualifies as an expert or whether the methodologies employed by such witness are reliable under Articles 702 through 705 of the Louisiana Code of Evidence. The motion shall be filed not later than sixty days prior to trial *568 and shall set forth sufficient allegations showing the necessity for these determinations by the court.
(2) The court shall hold a contradictory hearing and shall rule on the motion not later than thirty days prior to the trial. At the hearing, the court shall consider the qualifications and methodologies of the proposed witness based upon the provisions of Articles 104(A) and 702 through 705 of the Louisiana Code of Evidence. For good cause shown, the court may allow live testimony at the contradictory hearing.
(3) If the ruling of the court is made at the conclusion of the hearing, the court shall recite orally its findings of fact, conclusions of law, and reasons for judgment. If the matter is taken under advisement, the court shall render its ruling and provide written findings of fact, conclusions of law, and reasons for judgment not later than five days after the hearing.
(4) The findings of facts, conclusions of law, and reasons for judgment shall be made part of the record of the proceedings. The findings of facts, conclusions of law, and reasons for judgment shall specifically include and address:
(a) The elements required to be satisfied for a person to testify under Articles 702 through 705 of the Louisiana Code of Evidence.
(b) The evidence presented at the hearing to satisfy the requirements of Articles 702 through 705 of the Louisiana Code of Evidence at trial.
(c) A decision by the judge as to whether or not a person shall be allowed to testify under Articles 702 through 705 of the Louisiana Code of Evidence at trial.
(d) The reasons of the judge detailing in law and fact why a person shall be allowed or disallowed to testify under Articles 702 through 705 of the Louisiana Code of Evidence.
|1fi(5) A ruling of the court pursuant to a hearing held in accordance with the provisions of this Paragraph shall be subject to appellate review as provided by law.
In Robertson III, 77 So.3d at 354, this court pointed out that both Sherwin-Williams (in its motion to strike) and the trial court (in its reasons for judgment granting the motion to strike) had mis-characterized the substance of Dr. Mark’s testimony. After reviewing Dr. Mark’s affidavit and expert report, we summarized his expert opinion as follows:
... Dr. Mark’s opinion ... is that each “special” exposure to asbestos constitutes a significant contributing factor, and he defined a “special” exposure as an exposure for which there is scientific reason to conclude that such an exposure creates the risk of developing the disease, and that each of the special exposures to asbestos contributes to the total dose that causes diffuse malignant mesothelioma in a given patient and, in doing so, shortens the period necessary for diffuse malignant meso-thelioma to develop. Since each exposure to asbestos contributes to the total dose of asbestos disease and shortens the necessary period for asbestos disease to develop, Dr. Mark concludes that each exposure to asbestos is, therefore, a substantial contributing factor to the development of the disease that actually occurred, when it actually occurs

Id.

This court then set forth, in detail, the substance of Dr. Mark’s January 21, 2010 affidavit, which established his opinion on causation in this matter, as follows:
*569 ... Dr. Mark was asked to review the case of Harris Robertson and authored a letter (or expert report) dated August 5, 2008, which was attached as an exhibit to the affidavit. Based on his review of the material, he concluded that Harris Robertson was diagnosed with malignant mesothelioma. As stated in his expert report, Dr. Mark concluded that based on the exposure history, “all special exposures to asbestos contributed to and caused this lethal diffused malignant mesothelioma.” Further, in his opinion, all of Harris Robertson’s “special exposures to asbestos were significant contributing factors in the development of his diffused malignant mesothelioma,”
Dr. Mark stated that all of his statements in his expert report and in his affidavit were made with a reasonable degree of medical certainty, were based on his knowledge, experience and training, and were based on the materials described in the affidavit. He further Instated that the facts stated in the affidavit were sufficient to form a reliable basis for his opinion, that he was familiar with all of the literature cited in the affidavit that were used to formulate his medical opinions in the case, and that the methodology and basis for his opinions were not novel and were generally accepted in the medical and scientific community.
Dr. Mark stated that in formulating his opinion in this case, he reviewed: defense expert reports received by counsel for the plaintiffs, Harris Robertson’s medical and billing records, the deposition testimony of Bobby Robertson, Harold Robertson, Raymond Robertson, Frances Robertson, and Octave Otto Gu-tekunst, and medical studies and literature further detailed in the affidavit.
According to these materials, it was [Dr. Mark’s] understanding that Harris Robertson was a career drywall finisher and painter (in residential construction) from the early 1960s through the time of his diagnosis; that the entire drywall finishing process, including the mixing of the dry joint compound, the application of mud, the sanding of the mud, and the clean-up process, was very dusty; and that Harris Robertson and his brothers routinely or mainly used Gold Bond, Welcote, and Georgia-Pacific joint compound (or sheetrock mud). Additionally, he stated that in reaching his opinions, he took into account Harris Robertson’s use of a dust mask and respirator "during the course of his drywall finishing work.
Dr. Mark emphasized in his affidavit that he did “not believe that exposure to a single asbestos fiber can cause meso-thelioma or any other asbestos related disease” but rather it was his opinion that “every special exposure to asbestos contributes to cause mesothelioma.” In determining the relative contribution of any exposure to asbestos, Dr. Mark stated that it is important to consider a number of factors, .including, but not limited to: the nature of exposure, the ■level of exposure and the duration of exposure, whether a product gives off respirable asbestos fibers, whether a person was close or far from the source of fiber released, how frequently the exposure took place, how long the exposure lasted, whether engineering or other methods of dust control were in place, whether respiratory protection was used, the chemistry and physics of asbestos fibers, the pathophysiology of breathing; the movement of asbestos fibers in the lung, the molecular pathology of tumor development, and other scientific disciplines. Additionally, he stated that the “dose response model” for risk assessment has been used by OSHA, NIOSH, and other governmental entities for more than two decades, and *570 that he relied upon the attribution criteria espoused in the “Consensus Report, Asbestos, Asbestosis, and Cancer: The Helsinki Criteria for. Diagnosis and Attribution, Scan J. Work Environ Health, 23:311-6 (1997) as applied to the factual evidence” of Harris Robertson’s exposures.
Additionally, in Dr. Mark’s affidavit, he explained that diffuse malignant mesothelioma is a dose response disease — the more someone is exposed to asbestos, the greater their risk for development 11sof the disease. He stated that he believes there is a dose response relationship between the amount of asbestos to which an individual is exposed and the risk of developing mesothelioma and that this concept is generally accepted in the medical and scientific communities. He further explained that because asbestos dust is so strongly associated with mesothelioma, proof of significant exposure to asbestos dust is proof of specific causation, that the causal relationship between exposure to asbestos dust and the development of mesothelioma is so firmly established in the scientific literature that it is “accepted as a scientific ‘fact,’ ” and that diffuse malignant mesothelioma is known as a “Signal Tumor” for asbestos exposure and indicates prior asbestos exposure, even when the victim cannot recall the exposure which may have occurred years previously or may not have been apparent at the time. Dr. Mark stated that it was his opinion that diffuse malignant mesothelioma is a dose response disease and that the resulting disease is the cumulative result of the exposures to asbestos that a person receives.
Dr. Mark explained that the exposures to asbestos described by Harris Robertson’s co-workers (brothers) were not low dose exposures, as the exposures they described in their depositions were high level exposures that occurred for prolonged periods of time, and that each exposure to asbestos-containing dust from the use of products, above background levels, contributes to cause diffuse malignant mesothelioma.
Dr. Mark then concluded that it was his opinion with a reasonable degree of medical certainty that the ongoing exposure to dust from asbestos-containing finishing products, including joint compound, as described by Harris Robertson’s co-workers (brothers), and such cumulative exposures from Harris Robertson’s work with and around such products substantially contributed to the development of his malignant mesotheli-oma. Dr. Mark also specifically opined that to the extent that the Gold Bond, Welcote, and Georgia-Pacific products contained asbestos, Harris Robertson’s exposure to those finishing products was a substantial contributing factor in his development of malignant mesothelioma, Lastly, Dr. Mark noted that his opinions with regard to the specific causation of Harris Robertson’s malignant mesotheli-oma were based on his review of the evidence of exposure in this case, the medical and scientific literature cited in the affidavit concerning asbestos exposure and disease, and his knowledge, skill, experience and training as a physician who has studied in asbestos diseases for over four decades.[22]
| Robertson III, 77 So.3d at 354-357.
*571 This court then determined that the trial court legally erred in striking the testimony of Dr. Mark because it failed to comply with La. C.C.P. art. 1425(F) and further, on de novo review, concluded that Sher-win-Williams failed to prove that Dr. Mark’s opinion on causation was unreliable, thus warranting reversal of the trial court’s judgment granting the motion to strike the opinion of Dr. Mark, Robertson III, 77 So.3d at 358-359. On remand, Sherwin-Williams and the other defendants, interpreted Robertson III as a directive to the trial court to conduct a Dau-bert hearing in accordance with La. C.C.P. art. 1425(F). Specifically, the defendants’ claimed that a Daubert hearing was necessary so that: (1) the parties could offer testimony in support of or in opposition to Sherwin-Williams’ motion to strike the testimony of Dr. Mark and (2) the trial court could conduct a Daubert analysis of the anticipated causation testimony of Dr. Mark. The plaintiffs opposed the motion, arguing that a Daubert hearing was not necessary because Robertson III was dis-positive of the issue of the admissibility of Dr. Mark’s testimony, because this Court found Dr. Mark’s causation opinion was reliable. The trial court granted the motion to set a Daubert hearing,[23] and in doing so, stated as follows:
*572 | anI have the discretion to grant a [Dau-bert \ hearing. And as I read [Robertson III ], I’m almost mandated to have a [Daubert ] hearing. But at said hearing, the Court of Appeals made its own decision that I was wrong. And so we can do a vain and useless thing, we can have a [Daubert ] hearing which is going to be vain and useless. I’ll sit here for days and days and no matter what I hear, I’m going to adopt what the appellate court said.
... It’s not my decision to say whether the Court of Appeal is right or wrong. They are the Court of Appeal. And I clearly — I clearly read what they said. They went — they didn’t have to do it, but they went at length and described why Dr. Mark should be allowed to give his opinion. So I can have a [Daubert ] hearing and conclude that the methodology is wrong or that — or that his opinions are unreliable, not relevant, et cet-era under [Daubert] and that would be reversed because we already have three judges saying that Dr. Mark passes the [Daubert ] test. That’s how I read this opinion. I think that they have said Dr. Mark passes the [Daubert ] test. So I’m not going to play any more games with a ease as old as this one is. If I deny the motion for a [Daubert ] hearing, the defense is going to take a writ, and we’re going to be two more years before we resolve this case of Robertson versus As[h]y. So I’m inclined to do a vain and useless thing, which I’m not use to doing, that is grant the defense’s motion for a [Daubert ] hearing, and then no matter what happens at the [Daubert ] hearing[,] adopt [Robertson III], and conclude that Dr. Mark is fully qualified to testify before a fact finder.
... And I’m going to do my best to comply with [Robertson III] and to comply with ... [La. C.C.P. art. 1425, which the Court of Appeal] concluded that I didn’t do it right [in Robertson III ], and we’re going to do it right next time. Come prepared for a long hearing, folks, because we’re going to do this right.... So we’ll comply certainly with [La. C.C.P. art. 1425 and the mandates of the First Circuit. And then when it’s all over, I’ll just adopt ... the First Circuit’s opinion [in Robertson III ] and allow Dr. Mark to testify.
Li In August of 2012, the trial court then conducted a three-day contradictory Daubert hearing receiving volumes of documentary evidence, as well as live testimony [24] from Dr. Mark; Dr. Suresh Mool-gavkar, an epidemiologist, biostatistician, and quantitative risk assessor, who was accepted by the trial court as an expert in the field of epidemiology, biostatistics, quantitative risk assessment and carcinogenesis, including fiber carcinogeneis; Dr. Michael Graham, a pathologist, who was accepted by the court as an expert in pathology and forensic pathology and causation of asbestos-related diseases; and Dr. William Dyson, an industrial hygienist, who was accepted by the trial court as an expert in industrial hygiene and risk assessment. Despite the trial court’s statements on the record when it initially granted the motion for a Daubert hearing that it was going to adopt this court’s opinion in Robertson III and allow Dr. Mark to testify, at the conclusion of the *573 Daubert hearing, the trial court ruled as follows:
Before this Court is the defendants’ motion to exclude certain testimony of the plaintiffs’ causation expert Dr. Eugene Mark. The motion is granted in part and denied in part; specifically, defendants’ request that I exclude testimony that every special exposure or each and every exposure to asbestos was a substantial-contributing factor in the development of Mr. Robertson’s meso-thelioma. The motion is granted in that respect, and I will prohibit Dr. Mark from testifying before a jury that each special exposure to asbestos constitutes a significant-contributing factor, and I further prohibit Dr. Mark from giving his definition of special exposure, otherwise, he may give causation opinions in this case.
* * *
I come to the conclusions that I have to strike portions of his — Dr. Mark’s opinions based on what I’ve heard in this courtroom from other experts, specifically Dr. Moolgavkar’s testimony that Dr. Mark’s definition of special exposure is circular in his view. And I listened to Dr. Moolgavkar’s testimony and I find it compelling in that regard, and I agree that this definition is circular. Dr. Mark himself said on the witness stand that, quote, he was not aware of any other expert who uses the term special exposure. So under the [Daubert] ... factors, it seems to me, as I perform my gatekeeping role, that I have to exclude the opinions as I indicated.
182... the gatekeeping role under [Dau-bert ] tests the expert’s theories. The gatekeeper, the trial judge, has to consider whether the technique has be subject to peer-review or publication, the normal potential rate of error, and whether the methodology is generally accepted by the scientific community. Well, I’ve already made mention of experts who testified in this court who say that they are really not aware of this term in the scientific community known as special exposures. So under [Dau-bert ], that methodology of trying to define a special exposure as a substantial contributing factor of asbestos is not generally accepted in the scientific community and will not be allowed in this case.
Of course, ... an unsupported opinion can offer no assistance to the fact-finder and should not be admitted as expert testimony and that’s what I’m doing here today. I’m excluding this testimony regarding special exposures because it’s unsupported in my view after hearing the experts testify before me, and it will give no assistance to the fact-finder in my opinion.
... [In Robertson III, 77 So.3d at 355-357] the First Circuit ... summarized their understanding of Dr. Mark’s ... affidavit. And the First Circuit recited that Harris Robertson was a career drywall finisher and painter from the early 60’s to the time of his diagnosis. That the entire drywall finishing process— these are the opinions of Dr. Mark— including mixing of dry join compound, the application of the mud, the sanding of the mud, the clean-up process was very dusty. Dr. Mark considered Harris Robertson’s brothers’ testimony as to how they routinely used these Gold Bond, Welcote, and Georgia-Pacific compounds. Also, Dr. Mark explained that in his opinion, as recited by the First Circuit, that the exposures to asbestos described by Harris Robertson’s co-workers, that is his brothers, were not low-dose exposures, as the exposures they described, meaning the brothers in a deposition, were high-level *574 exposures that occurred for prolonged periods of time, and that each exposure to asbestos containing dust from the use of products above background contributes to cause defused [sic] malignant mesothelioma. That’s what the First Circuit said in reviewing the affidavit of Dr. Mark. First Circuit also said that Dr. Mark then concluded — that it was his opinion within a reasonable degree of medical certainty that the ongoing exposure to dust from asbestos-containing finishing products, including joint compounds as described by Robertson’s brothers, and such cumulative exposures from Robertson’s work with and around such products substantially contributed to the development of his malignant mesothelioma. So I think I’ve indicated that I’m not striking his causation opinions except in the very limited fashion that I said.
... And in summary, I grant the defense motion in part and deny it in part. I prohibit Dr. Mark from testifying before the jury that each special exposure to asbestos constitutes a significant-contributing factor. I further prohibit Dr. Mark from giving his definition of special exposure, otherwise he may give causation opinions.
12aThe trial court then signed a “Daubert order” on August 21, 2012 that provided: “IT IS ORDERED that the defense motion is GRANTED in part and DENIED in part. Specifically, this court will prohibit testimony from Dr. Eugene Mark that each ‘special exposure’ to asbestos constitutes a significant contributing fact and further prohibit Dr. Mark from giving his definition of special exposure. Otherwise, Dr. Mark is allowed to give causation opinions.”
On appeal, the plaintiffs argue that the trial court abused its discretion in prohibiting Dr. Mark from using the phrase “special exposure or defining it because Dr. Mark’s use of this phrase was not a methodology, but rather a grammatical choice of words to more precisely express a well-established legal and medical principle. The plaintiffs also argue that Dr. Mark’s causation analysis was not circular and that his methodology was soundly based on the scientific method. We agree, and find, based on our review of the record, that the criticisms or objections that the defendants (and their experts) have with regard to the causation opinion of Dr. Mark do not relate to Dr. Mark’s methodology, but rather, relate to the application of his methodology and the conclusions derived from the application of that methodology. As previously noted, only a question of the validity of the methodology brings Daubert into play. MSOF Corporation v. Exxon Corporation, 2004-0988 (La.App. 1st Cir.12/22/05), 934 So.2d 708, 718, writ denied, 2006-1669 (La.10/6/06), 938 So.2d 78.
At the Daubert hearing, the testimony and evidence focused on: (1) Dr. Mark’s use of the term “special exposures” (2) the medical and scientific studies that Dr. Mark did or did not rely on when formulating his opinion on causation; (3) Dr. Mark’s assumption that absent therapeutic radiation or erionite exposure, mesothelio-ma is caused by asbestos exposure, without regard to the possibility of spontaneous or idiopathic mesotheliomas; (4) whether Dr. Mark took into account the | ^potency of different asbestos fiber types — i.e., chrysotile vs. amphibole; and (5) Dr. Mark’s failure to quantify dose.
Dr. Mark’s opinion is that each “special exposure” to asbestos constitutes a significant contributing factor in the development of mesothelioma, and he defined “special exposure” as an exposure for which there is a scientific reason or evidence (including epidemiological evidence) *575 to conclude that such exposures increased the risk of developing diffuse malignant mesothelioma. Dr. Moolgavkar believed that Dr. Mark’s definition of “special exposure” was circular, and that “special exposure” should be defined in terms of some quantitative exposure level that was well-recognized, like fiber per cubic centimeter years. Dr. Graham testified that the term “special exposure” was “really not defined in the scientific literature” and that he had never heard that term being used in the scientific and medical community.
Although Dr. Mark acknowledged that this term has not been used by any other expert in assessing asbestos exposures, he stated that it was used by the United States government in assessing radiation exposure. Dr. Mark testified that he first began using the term “special exposure” in a peer-reviewed article that he co-authored for Seminars in Diagnostic Pathology in 2006, which was entitled “Pathological recognition of diffuse malignant mesothelioma of the pleura: the significance of the historical perspective as regards this tumor.” Therein, Dr. Mark wrote that that “all special exposures to asbestos together contribute to cause [diffuse malignant mesothelioma] based on modern understanding of cellular and molecular pathology in the multistage pathway of oncogenesis and calculation of mortality rates based on cumulative lifetime exposure.” Richard L. Kradin, M.D. and Eugene Mark, M.D., “Pathological recognition of diffuse malignant mesothelioma of the pleura: the significance of the historical perspective as regards this tumor,” Seminars in Diagnostic Pathology 23 (2006); 25. (Footnotes omitted).
li>sDr. Mark, noting that the word “special” means “distinctive or unique,” chose the term “special exposure” because he wanted to be clear that in reaching an opinion or conclusion about causation, he was excluding trivial or inconsequential exposures, which do not contribute to or cause mesothelioma. Dr. Mark found the use of the phrase “special exposure” to be useful because it reflected that the cause of mesothelioma is not based on an absolute dose (such as fiber per cubic centimeter years), but on whether there was a scientific reason to believe that the form of the exposure, based on the knowledge of that exposure, would be an exposure expected to increase one’s risk of developing mesothelioma. Stated differently, the term was intended to reflect the exposures that Dr. Mark considered, based on a qualitative cumulative assessment of the exposures, to have substantially contributed to causing mesothelioma and the exposures that could be excluded as having substantially contributed to it. Dr. Mark stated that the term “special exposure” had nothing to do with the methodology that he followed in reaching his conclusion on causation. Thus, we find the term “special exposure” was a phrase chosen by Dr. Mark to express the results of his methodology for determining causation of meso-thelioma; it was not part of his methodology-
With regard to the methodology actually employed by Dr. Mark in reaching the conclusion that Mr. Robertson’s mesothelioma was caused by his special or cumulative exposures to asbestos, we find that the evidence establishes that Dr. Mark followed and based his opinion on a scientifically valid method and that he properly applied that method in this case. The methodology employed by Dr. Mark was: (1) he reviewed the medical records and pathology materials and determined the disease that afflicted Mr. Robertson; (2) he then reviewed the sworn deposition testimony of Mr. Robertson’s co-workers that detailed the type and scope of Mr. Robertson’s work history and exposure to *576 asbestos; (3) he correlated the exposure data with his library of scientific articles detailing the | gdevels of asbestos exposure generated by the use of asbestos containing joint compounds, including the “Helsinki paper.” and his knowledge of other peer-reviewed medical literature and ascertained that there was a basis in the literature, through epidemiological studies, case reports, and other biological evidence, supporting general causation (i.e., that the inhalation of chrysotile asbestos from joint compound products can cause mesothelio-ma); and (4) he then applied all of this information to the facts of Mr. Robertson’s specific history of asbestos exposure, ruling out other possible causes of meso-thelioma, such as therapeutic radiation and erionite exposure. The validity of this scientific methodology was confirmed by Dr. Moolgavkar, who stated that his methodology for determining causation in a mesothelioma case would be to evaluate the exposure history, determine the trade that the individual was engaged in, and then look at the epidemiological literature to see what studies have shown about whether that trade was at an increased risk of developing mesothelioma. And, Dr. Graham, who is the defendant’s expert on causation, utilized the same methodology when formulating his opinion on causation. When an expert’s opinions are grounded in methods and procedures of science rather than just speculative belief or unsupported speculation, the Dauberb standard of reliability is satisfied. Arceneaux v. Shaw Group, Inc., 2012-0135 (La. App. 1st Cir.9/24/12), 103 So.3d 1086, 1093, writ denied, 2012-2732 (La.3/1/13), 108 So.3d 1177.
Dr. Moolgavkar criticized Dr. Mark’s opinion, claiming that he did not think that Dr. Mark reviewed and fairly considered all of the available epidemiological evidence on the issue of chrysotile exposure and diffuse malignant mesothelioma. While Dr. Moolgavkar admitted that Dr. Mark relied on epidemiological studies, he disagreed that those studies supported Dr. Mark’s conclusions. However, this disagreement over the interpretation of the scientific literature is not a criticism of Dr. Mark’s methodology, but rather a criticism of the application of or the | ^conclusions derived from the application of that methodology, and thus, does not bring Daubert into play. See MSOF Corporation, 934 So.2d at 718. Additionally, Dr. Moolgav-kar claims that Dr. Mark should have considered epidemiological studies involving other trades that Mr. Robertson was not engaged in, such as auto mechanics, to evaluate the risk of developing mesothelio-ma from low levels of exposure to chryso-tile asbestos, However, Dr. Mark, noting that epidemiology was one of many tools to be ^considered in determining causation,[25] chose to rely on epidemiological studies pertaining to drywall workers (the trade in which Mr. Robertson was engaged) and other trades that overlapped with or utilized drywall workers in the process of finishing walls, including carpenters, painters and plasterers. Dr. Moolgavkar also criticized Dr. Mark for relying on case studies, stating that case studies were limited and insufficient establish causation, although he later admitted there were instances when it was appropriate to rely on ease studies. Dr. Mark relied on epidemiological and case studies or reports and found there was a basis to conclude that the inhalation of chrysotile asbestos from joint compound products can cause meso-thelioma. To the extent that Dr. Mark may not have reviewed all of the epidemiological evidence that Dr. . Moolgavkar *577 thought was appropriate and to the extent that he relied on case studies that Dr. Moolgavkar deemed inappropriate, these factors affect only the weight to be afforded his conclusions and may serve as a basis for attack by the defendants on cross examination at trial, but it does not make the opinion evidence unreliable or inadmissible under Daubert. See MSOF Corporation, 934 So.2d at 720.
Additionally, both Dr. Moolgavkar and Dr. Graham criticized Dr. Mark for making the assumption that absent a history of erionite exposure or therapeutic radiation, diffuse malignant mesothelioma is asbestos related. Both Dr. |gsMoolgavkar and Dr. Graham believed that mesothelio-mas could occur spontaneously or ideo-pathically (without exposure to asbestos). Essentially, Dr. Mark stated that because asbestos is so strongly associated with mesothelioma, proof of significant exposure is proof of specific causation; that diffuse malignant mesothelioma is known as a signal tumor for asbestos exposure; and that once he has made a diagnosis of diffuse malignant mesothelioma and finds no history of erionite exposure or therapeutic radiation, he assumes that the diffuse malignant mesothelioma is asbestos related. Dr. Mark acknowledged that there was literature about varying percentages of diffuse malignant mesothelio-mas that were not associated with a prior history of asbestos exposure; however, he did not believe that there were any idiopathic diffuse malignant mesotheliomas or spontaneous malignant mesotheliomas and that such cases could be attributed to inadequate occupational histories. The existence or non-existence of idiopathic or spontaneous mesotheliomas is a factual dispute between the experts, and thus goes to the credibility of the testimony and not its admissibility or reliability. See Dixon v. Tucker, 47,118 (La.App. 2nd Cir. 5/16/12), 92 So.3d 1100, 1105, unit not considered, 2012-1838 (La.11/9/12), 100 So.3d 824. Furthermore, as previously noted, the Daubert inquiry must be tied to the specific facts of the particular dispute. Robertson III, 77 So.3d at 359. The dispute between Drs. Mark, Moolgavkar, and Graham over the existence of spontaneous or idiopathic mesotheliomas is irrelevant under the facts of this case, as Mr. Robertson’s mesothelioma was not spontaneous or idiopathic. Rather, it was confirmed to have been caused by asbestos exposure, given the evidence of asbestos bodies in his lung.
Dr. Moolgavkar and Dr. Graham also criticized Dr. Mark because he did not make a distinction between exposures to chrysotile asbestos and amphibole asbestos when reaching his conclusions on causation. Specifically, DrJ^Moolgavkar and Dr. Graham thought that Dr. Mark did not account for the fact amphibole asbestos was far more potent of a mesotheliogen than chrysotile. Dr. Mark acknowledged that there were physical, chemical, and potency differences between various asbestos fiber types; however, he believed, in accordance with the various scientific and cancer research organizations, that all commercial types of asbestos were capable of causing diffuse mesothelioma and that there was no known safe level of exposure to asbestos. Dr. Moolgavkar acknowledged that the International Agency for Research on Cancer, the highly respected cancer agency of the World Health Organization, had concluded that there was sufficient evidence in humans for the carcinogenicity of all forms of asbestos in causing mesothelioma and cancer, and that asbestos, in all of its forms was both an occupational and environmental hazard responsible for the ongoing increases in the number of mesotheliomas, lung cancer, asbestosis, and other diseases. Thus, with regard to the distinc *578 tion between chrysotile and amphibole asbestos fiber types, herein, the issue is not whether chrysotile is capable of causing mesothelioma, but rather on its potency. — ■ ie., whether in Mr. Robertson’s case, there was sufficient exposure to chrysotile asbestos to substantially contribute to the development of his disease. ■ This is a factual issue, and thus, more appropriately, a question for the jury. See Rando, 16 So.3d at 1091, citing Borel 493 F.2d at 1094.
Lastly, Drs. Moolgavkar and Graham criticized Dr. Mark because he did not make a quantitative cumulative assessment of the dose of asbestos to which Mr. Robertson was exposed. Dr. Mark admitted that he made no quantitative calculation of Mr. Robertson’s cumulative exposure to asbestos because the data was not available. Dr. Graham, while admitting that Mr. Robertson would have had exposure to joint compounds that contained asbestos, confirmed that there was insufficient detail to make a quantitative cumulative assessment of the dose. Furthermore, Dr. Mark noted that while quantitative cumulative fiber dose, as |anexpressed in fiber per cubic centimeter years, was an important parameter to consider when trying to apportion the relative risk of products, he believed that it was not relevant when a patient already has the disease because there is no speculation as to whether the patient is at risk for developing the disease. Dr. Mark opined that while dose has to be taken into consideration when making a determination about a special exposure, since there is no known, safe level of exposure to asbestos, the usual concept of dose only means that there is a dose-response relationship between exposure to asbestos and mesothelioma, and that the absolute dose is not the relevant issue.
As noted hereinabove, the plaintiff can meet his burden of proving causation through either a quantitative or a qualitative assessment of asbestos exposure. Dr. Moolgavkar, was unable to provide any opinion on the qualitative exposure and occupational history of Mr. Robertson. However, the record reveals that Dr. Mark did a qualitative assessment of Mr. Robertson’s exposures (ie., he evaluated the exposures based on their frequency, based on their proximity and based on their intensity) and determined that Mr. Robert'son had substantial, sequential, incremental, heavy exposures to chrysotile fibers for a long period of time (19 years) and that these exposures constituted special exposures.[26]
*579 |?l1In our review of the trial court’s Daubert order in conjunction with the evidence offered at the hearing, we are mindful that it is not within our province to weigh the evidence or testimony of the experts and their opinions, but rather to ensure that the trial court properly performed its gatekeeping function when it evaluated the reliability of the testimony of Dr. Mark under the standards set forth in Daubert. Although the trial court is afforded broad discretion in determining whether expert testimony is reliable under Daubert, that discretion is premised upon an understanding that Daubert is intended to protect the sanctity of the fact finding process by assessing the validity of the methodology employed by an expert and not the expert’s application of that methodology or his conclusions derived from the application of that methodology. Certainly, not all experts are equal; however, issues involving the credibility of the expert, the weight to be given to the expert’s testimony, and the resolution of conflicts between expert opinions testimony are to be assessed at trial by the trier of fact.
In this case, the majority of the evidence presented at the Daubert hearing was framed by specific objections that Sher-win-Williams (and the other defendants) had with regard to the causation opinion of Dr. Mark, which did not relate to his methodology, but rather, involved the conclusions derived from applying that methodology to the facts of this case, and thus pertained to his credibility and the weight of his opinion testimony. The evidence at the hearing concerning the proper methodology to be utilized in formulating an opinion on causation established that Dr. Mark’s methodology was typical of the process | ^undertaken by an expert, conformed to accepted scientific principles, and thus was reliable-under the standards set forth in Daubert. Therefore, we find that the trial court abused its discretion in granting, in part, Sherwin-Williams’ motion to strike and in prohibiting Dr. Mark from testifying that each “special exposure” to asbestos constituted a significant contributing fact and in prohibiting Dr. Mark from giving his definition of special exposure. Accordingly, the August 21, 2012 judgment of the trial court or “Dau-bert order” is hereby reversed.
2. Sherwin-Williams’ Motion for Summary Judgment

a. Summary Judgment Law

A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. Robertson III, 77 So.3d at 345. Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B); Robertson III, 77 So.3d at 345-346.
Summary judgments are reviewed on appeal de novo. Robertson III, 77 So.3d at 346. Thus, this court uses the same criteria as the trial court in determining *580 whether summary judgment is appropriate — whether there is a genuine issue of material fact and whether mover is entitled to judgment as a matter of law. Id.
On a motion for summary judgment, the initial burden of proof is on the moving party. If, however, the moving party will not bear the burden of proof at trial on the matter before the court, the moving party’s burden of proof on the motion is satisfied by pointing out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, the non-moving party must produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial. | .^Failure to do so shows that there is no genuine issue of material fact. Id.; La. C.C.P. art. 966(C)(2). Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. Robertson III, 77 So.3d at 346; see also La. C.C.P. art. 967(B). Any doubt as to a dispute regarding a genuine issue of material fact must be resolved against granting the motion and in favor of a trial on the merits. Robertson III, 77 So.3d at 346.
A “genuine issue” is a “triable issue,” that is, an issue on which reasonable persons could disagree. If, on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. Id. In determining whether an issue is genuine, a court should not consider the merits, make credibility determinations, evaluate testimony, or weigh evidence. Id. A fact is material if it potentially ensures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. Id. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can only be seen in light of the substantive law applicable to the case. Id.

b. Merits of Sherwin-Williams’ Motion for Summary Judgment

As noted above, the plaintiffs will bear the burden of proving at trial that that Harris Robertson’s significant exposure to asbestos containing products manufactured or sold by Sherwin-Williams was a substantial factor in bringing about or causing his mesothelioma. Sherwin-Williams, as a defendant, will not bear the burden of proof at trial; however, as the mover in the motion for summary judgment, it had the initial burden of proof pursuant to La. C.C.P. art. 966(C)(2) to support and point out that there was an absence of factual support for this element of the plaintiffs’ claim. In Robertson III, 77 So.3d at 349 n. 14, this court specifically set forth that for Sherwin-Williams to meet its initial burden on summary judgment | S4on this issue, Sherwin-Williams had to either: (1) offer “evidence in support of its motion to show that Harris Robertson’s exposures were not medically significant” or (2) offer evidence that the plaintiffs’ “did not have a medical causation expert on this issue.” In the absence of such evidence, a motion for summary judgment on the issue would be unsupported and would not shift the burden to the plaintiffs to demonstrate, at the summary judgment stage, that the exposures on which the plaintiffs were relying were medically significant. Id.
In Sherwin-Williams’ motion for summary judgment, it claimed “that [the] [p]laintiffs have no evidence capable of sustaining their burden of proving that asbestos from products purchased at Sher-win-Williams’ stores was a substantial contributing factor in causing Harris Robert *581 son’s mesothelioma.” Essentially, in the' motion for summary judgment, the defendants claimed that there was an absence of factual support for the plaintiffs’ claims because the plaintiffs did not have an expert industrial hygienist (or anyone else qualified to opine about the intensity and duration of or total dose or amount of exposure Harris Robertson had to asbestos containing products) and because the trial court limited Dr. Mark’s causation testimony in the Daubert hearing to general causation and specifically prohibited him from testifying that each “special exposure” to asbestos constituted a substantial contributing factor in causing Harris Robertson’s mesothelioma.
In support of their motion for summary judgment, Sherwin-Williams pointed to the deposition testimony of Harris Robertson’s three brothers (Harold Robertson, Raoul “Bobby” Robertson, and Raymond Robertson), Glynn Pierret, and Ray Montgomery, all of whom had previously worked with Harris Robertson in the drywall finishing and painting business. Collectively, this testimony established that Harris Robertson used asbestos-containing dry wall joint compound (or “sheetrock mud”), including “Gold Bond,” “USG,” and “Weleote,” which was purchased from several different stores or suppliers, including Sherwin-jWilliams ,35 In addition, Sher-win-Williams pointed to deposition testimony of Dr. Mark, wherein he stated that with regard to Sherwin-Williams, his opinion was simply that “Mr. Robertson purchased supplies from Sherwin-Williams.” Based on this evidence, as well as the Daubert ruling, Sherwin-Williams claimed that the evidence established only that Harris Robertson used many brands of drywall joint compound purchased from many different stores and did not establish that the products bought at Sherwin-Williams contributed to Harris Robertson’s disease or death to any particular degree or proportion, much less that its products substantially contributed to his disease or death.
The plaintiffs opposed the motion with the deposition testimony from Harris Robertson’s two brothers (Harold Robertson and Raymond Robertson) and a new affidavit from Dr. Mark.[27] The deposition *582 testimony of Harris Robertson’s brothers established that Harris Robertson performed drywall work starting in the 1960’s and that he used dry wall joint compound (or “sheetrock mud”), including “Gold Bond,” “USG,” and “Welcote,” which was purchased from several different stores or suppliers, including Sherwin-Williams. Their testimony also established |afithat the entire drywall process — mixing, sanding, and clean up — was very dusty and that the joint compound dust from the process was inhaled.[28]
The new affidavit of Dr. Mark, executed on December 21, 2012, sets forth his qualifications, an explanation of the scientific method, and recent developments in the study of asbestos. Dr. Mark explained that these studies, when taken as an aggregate, indicate that all types of asbestos are fibrogenic and oncogenic, albeit to different degrees depending upon the chemistry and physics of the asbestos. Dr. Mark further explained that these studies also indicate that diffuse malignant mesothelio-ma is caused by asbestos and that it is the only established cause in the United States, apart from radiotherapy given to the site of the tumor. With regard to Harris Robertson’s exposure to Gold Bond joint compound, Dr. Mark stated as follows:
I have been asked to assume the following facts are proven to be true.
Mr. Harris Robertson (“Robertson”) worked as a career-sheetrock finisher from approximately the early 1960s through 2005. From at least the early 1960s through the mid 1970s, Robertson worked with Gold Bond dry-mix joint compound a lot and also used Gold Bond ready mix joint compound when it was available. The Gold Bond dry-mix joint compound contained from 1.1% to 23.1% chrysotile asbestos throughout this time period. The Gold Bond ready mix joint compound contained 0.9% to 10.9% chrysotile asbestos through this time period. As part of his work, Robertson mixed, sanded, and cleaned up the Gold Bond dry-mix joint compound and sanded and cleaned up the Gold Bond ready-mix joint compound. This created a very dusty environment. While performing this work, he did wear a paper mask.
In my opinion, to a reasonable degree of medical certainty, if these facts are proven to be true, this exposure to asbestos would be Insignificant and would be a substantial contributing factor in the development of his disease.
With regard to Sherwin-Williams, Dr. Mark stated as follows:
I have been asked to assume the following facts are proven to be true.
Mr. Harris Robertson (“Robertson”) worked as a career-sheetrock finisher from approximately the early 1960s through 2005. From approximately the early to mid 1960s through the mid 1970s, Robertson occasionally purchased joint compound products from Sherwin[-]Williams stores. From the early 1960s through at least *583 June 27, 1975[,] at least 60% of joint compound products Robertson purchased from Sherwin[-]Williams contained asbestos. As part of his work with these joint compound products purchased from Sherwin[-]Williams, Robertson mixed, sanded, and cleaned up the joint compound. This created a very dusty environment. While performing this work, he did wear a paper mask.
In my opinion, to a reasonable degree of medical certainty, if these facts are proven to be true, this exposure to asbestos would be significant and would be a substantial contributing factor in the development of his disease.
The plaintiffs contended that this evidence was sufficient to establish that they would be able to satisfy their evidentiary burden of proving that Harris Robertson’s significant exposure to asbestos containing products sold by Sherwin-Williams was a substantial factor in bringing about or causing his mesothelioma.
A hearing on the motion for summary judgment was held on January 8, 2013. Following the argument of counsel, the trial court granted Sherwin-Williams’ motion for summary judgment for the following reasons:
Before this Court is the motion of Sher-win-Williams for summary judgment, claiming that these plaintiffs cannot sustain their burden of proof that asbestos from products purchased at Sherwin-Williams’ stores was a substantial contributing factor in causing Harris Robertson’s mesothelioma. I agree with the argument of Sherwin-Williams. I grant the motion for summary judgment filed by Sherwin-Williams. The plaintiff[s] rel[y] on the expert testimony of — of Doctor Mark and in a Daubert hearing, I limited his opinions in this case, said he could not give opinions about special exposures to asbestos constituting a significant contributing factor. So, the plaintiff[s are] left with general opinions by Dr. Mark. The plaintiff[s do] not have any other experts, such as an industrial hygienist or | ^anyone else who could explain to a jury the intensity or the duration of total dose that Harris Robertson may have been exposed to from Sherwin-Williams products.... The plaintiff[s have] failed to come forward today with proof that [Harris Robertson] had significant exposure to the Sherwin-Williams products.[29] For those reasons, [this court] grant[s] the motion for summary judgment. [ (Emphasis added) ].
Based on our de novo review of the record, we find Sherwin-Williams failed to meet its initial burden of pointing out that there was an absence of factual support for the plaintiffs’ claim that Harris Robertson’s exposure to asbestos-containing products purchased at (or sold by) *584 Sherwin-Williams was a substantial factor in bringing about his mesothelioma. The evidence offered by Sherwin-Williams established only what this court has already determined — that there are genuine issues of material fact as to whether Harris Robertson routinely and regularly used and inhaled (and thus was significantly exposed to) the asbestos-containing “Gold Bond” joint compound in his dry wall finishing work and whether Harris Robertson (or other people for or with whom he worked) purchased the asbestos containing joint compound “Gold Bond” from Sherwin-Williams’ stores. See Robertson III, 77 So.3d at 352.
Sherwin-Williams did not offer, in. support of its motion for summary judgment, evidence to show that Harris Robertson’s exposures to asbestos-containing products sold by Sherwin-Williams were not medically significant. Instead, Sherwin-Williams chose to rely on the trial court’s Daubert ruling that limited Dr. Mark’s testimony in order to establish that the plaintiffs did not have a |aamedical causation expert on this issue. Since the trial court’s Daubert ruling has been reversed herein and considering the lack of evidence offered by Sherwin-Williams to establish that the exposures on which the plaintiffs were relying were not medically significant, Sherwin-Williams’ motion for summary judgment was unsupported and was improvidently granted.
Furthermore, even though Sherwin-Williams’ unsupported motion for summary judgment did not shift the burden to the plaintiffs to show that there were issues of fact — i.e., that Harris Robertson’s exposures to asbestos from products purchased at Sherwin-Williams were medically significant — we find, on de novo review, that the evidence offered by the plaintiffs in opposition to the motion for summary judgment, including the new affidavit of Dr. Mark sufficiently established that there were genuine issues of material fact as to whether Harris Robertson’s exposures to asbestos-containing products sold by Sherwin-Williams was a substantial factor in his causing his mesothelioma. Accordingly, Sherwin-Williams was not entitled to summary judgment, and we reverse the January 29, 2013 judgment of the trial court that granted Sherwin-Williams’ motion for summary judgment and dismissed the plaintiffs’ claims against Sherwin-Williams.
CONCLUSION
For all of the above and foregoing reasons, the August 21, 2012 judgment of the trial court prohibiting certain testimony from Dr. Eugene Mark is reversed and the January 29, 2013 judgment of the trial court granting Sherwin-Williams’ motion for summary judgment and dismissing the plaintiffs’ claims against Sherwin-Williams, with prejudice, is reversed. This matter is remanded to the trial court for further proceedings.
All costs of this appeal are assessed to the defendant/appellant, The Sherwin-Williams Company.
AUGUST 21, 2012 JUDGMENT REVERSED; JANUARY 29, 2013 JUDGMENT REVERSED; REMANDED.
PETTIGREW, J., concurs.

. See Daubert v. Merrell Dew Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and La. C.C.P. art. 1425(F).

. We refer to the instant appeal, Robertson v. Doug Ashy Bldg. Materials, Inc., 2014-0141 (La.App. 1st Cir.12/23/14), 168 So.3d 556 as "Robertson IV." In two companion cases also rendered this date, the plaintiffs separately appealed the trial court’s grant of summary judgment in favor of Union Carbide Corporation (Robertson v. Doug Ashy Bldg. Materials, Inc., 2014-0142 (La.App. 1st Cir.12/23/14), - So.3d - ("Robertson V”)) and Georgia-Pacific Corporation (Robertson v. Doug Ashy Bldg. Materials, Inc., 2014-0143 (La. App. 1st Cir.12/23/14),-So.3d-("Robertson VI ”)).

. Two companion cases were rendered the same date as Robertson III, i.e., Robertson v. Doug Ashy Bldg. Materials, Inc., 2010-1547 (La.App. 1st Cir.10/4/11), 77 So.3d 323, writ denied, 2011-2468 (La.1/13/12), 77 So.3d 972 ("Robertson I") and Robertson v. Doug Ashy Bldg. Materials, Inc., 2010-1551 (La.App. 1st Cir 10/4/11), 77 So.3d 360, writ denied. 2011-2431 (La.1/13/12), 77 So.3d 973 ("Robertson II”). See footnote 6.

. Georgia-Pacific was named as a defendant in the plaintiffs’ original petition, but on.April 22, 2008, was dismissed without prejudice. However, Georgia-Pacific was added as a defendant again in the plaintiffs' first supplemental and amended petition filed on November 25, 2008. See footnote 7.

. In two companion cases also rendered [the date of Robertson III ], the plaintiffs separately appealed the trial court’s grant of summary judgment in favor of Georgia-Pacific [Robertson I] and in favor of Union Carbide [Robertson II}. On December 3, 2010, this court *560 denied the defendants' motion to consolidate these related appeals, but ordered that the appeals be placed on the same docket and assigned to the same panel. Robertson v. Doug Ashy Building Materials, 2010-1552 (La.App. 1st Cir.12/3/10)(unpublished action).

. The plaintiffs subsequently filed a first supplemental and amended petition on November 25, 2008, for the sole purpose of adding additional defendants who were identified during discovery proceedings, including Le-vert-St. John LLC ("Levert-St. John”). On May 19, 2009, the plaintiffs filed a second supplemental and amended petition for the purpose of specifically pleading the plaintiffs’ claims against the defendants added in the first supplemented and amended petition. In [Robertson III], no issues have been raised with regard to those defendants or claims.

. Thereafter, both Georgia-Pacific and Union Carbide filed a motion seeking the same relief.

. Sherwin-Williams also filed a motion for summary judgment on December 18, 2009, seeking dismissal from this action on the basis that it was merely an alleged retailer of products that other companies manufactured (that it was a "non-manufacturing seller”) and that there was no evidence to support a finding of fault related to these retail sales, or alternatively partial summary judgment dismissing the claims arising out of its retail sales. This "non-manufacturing seller” motion for summary judgment was also denied by the judgment rendered on January 19, 2010, and signed on February 2, 2010. No issues have been raised in this appeal with regard to the nonmanufacturing seller motion for summary judgment.

10. Both Union Carbide and Georgia-Pacific joined with Sherwin-Williams in opposing the plaintiffs' motion for new trial.

11. At the hearing, the trial court initially denied the motion for new trial, but subsequently during the hearing, it decided to grant both the motion for new trial and the motion for summary judgment.

. The April 6, 2010 judgment lacked appropriate decretal language. Accordingly, on March 14, 2011, this court issued an interim order remanding this matter for the limited purpose of having the trial court sign a valid written judgment that included appropriate *562 decretal language as required by La. C.C.P. art.1918 and to have the record supplemented with the new judgment. See Robertson v. Doug Ashy Building Materials, Inc., 2010-1552 (La.App. 1st Cir.3/14/11) (unpublished action).

. Although the judgments granting the motion to strike the testimony of Dr. Mark and denying the plaintiffs' motion for new trial on die motion to strike are interlocutory, non-appealable judgments, see La. C.C.P. arts. 1841 and 2083, when an appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to him in addition to the review of the final judgment. See Judson v. Davis, 2004-1699, p. 8 (La.App. 1st Cir.6/29/05), 916 So.2d 1106, 1112-1113, writ denied, 2005-1998 (La.2/10/06), 924 So.2d 167. Thus, in this case, we can consider the correctness of those interlocutory judgments in conjunction with the appeal of the judgment granting Sherwin-Williams’ motion for summary judgment, which is a final and ap-pealable judgment. See Ballard v. Waitz, 2006-0307, pp. 4-5 (La.App. 1st Cir. 12/28/06), 951 So.2d 335, 338, writ denied, 2007-0846 (La.6/15/07), 958 So.2d 1193; People of Living God v. Chantilly Corporation, 251 La. 943, 947-948, 207 So.2d 752, 753 (1968).

. Based on this court's ruling reversing both the February 23, 2010 and the April 5, 2011 judgments, we concluded that all issues relating to the denial of the plaintiffs' motion for new trial on the motion to strike (the April 6, 2010 judgment) were moot. Robertson III, 77 So.3d at 359 n. 23.

. In addition, this court noted that to the extent Sherwin-Williams' motion for new trial could be construed as a new motion for summary judgment on the issue of "substantial cause,” Sherwin-Williams failed to prop- ■ erly support its assertion that there was an absence of factual support to establish that the exposure to asbestos-containing products purchased at or sold by Sherwin-Williams caused or was a substantial factor in bringing about Harris Robertson's mesothelioma because "Sherwin-Williams offered no evidence in support of its motion to show that Harris Robertson's exposures were not medically significant or that [the plaintiffs] did not have a medical causation expert on this issue.” Robertson III, 77 So.3d at 349 n. 14. Thus, "Sher-win-Williams’ unsupported motion did not shift the burden to the plaintiffs to demonstrate at the summary judgment stage, that the exposures on which it was relying on were medically significant.” Id.

. Prom this ruling of the trial court, the plaintiffs filed an application for supervisory writs, which this court denied. See Robertson v. Doug Ashy Building Materials, Inc., 2012-1017 (La.App. 1st Cir.8/9/12)(unpublished writ action).

. Although the August 21, 2012 judgment or Daubert order is an interlocutory judgment, which is generally not appealable, we can consider the correctness of the order/judgment in conjunction with the appeal of the January 29, 2013 judgment, which is a final appealable judgment. See footnote 13.

. In order for a plaintiff to recover and for liability to attach under a duty/risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duly element); (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element). Robertson III, 77 So.3d at 346-347, citing Rando v. Anco Insulations Inc., 2008-1163, 2008-1169 (La.5/22/09), 16 So.3d 1065, 1086.

. See also Arabie v. CITGO Petroleum Corp., 2010-2605 (La.3/13/12), 89 So.3d 307, 321-322 (in a toxic chemical exposure case, the plaintiffs’ expert did not know the quantitative level of exposure to the chemicals, but instead relied on qualitative information to reach the conclusion that the plaintiffs were exposed to a substantial amount of the toxic chemicals, and further, the defendant’s argument that the plaintiffs were required to prove exposure to the chemicals by means of scientific evidence, such as air monitoring data, was specifically rejected).

. In Robertson III, 77 So.3d at 352, this court held that that Sherwin-Williams was ■ not entitled to summary judgment on the first prong of cause-in-fact of the plaintiffs’ injuries — whether Harris Robertson had substantial asbestos exposure from products bought at Sherwin-Williams — because the plaintiffs had put forth sufficient evidence establishing that there were genuine issues of fact as to this issue.

. In Kumho Tire Company, 526 U.S. at 141, 119 S.Ct. at 1171, the United States Supreme Court held that the standard governing the admissibility of expert evidence applied not only to testimony based on "scientific” knowledge, but also to testimony based on “technical” and "other specialized knowledge.”

. In Robertson III, 77 So.3d at 357 n. 19, we recognized that Dr. Mark's opinions on causation were similar in nature to the expert opinion testimony set forth in Rando, 16 So.3d at 1091. See also Austin v. Abney Mills, Inc., 2001-1598 (La.9/4/02), 824 So.2d 1137, 1141-1142; Egan v. Kaiser Aluminum & Chemical Corp., (La.App. 4 th Cir. 5/22/96), 677 So.2d 1027, 1034-1035, writ denied, 96-2401 (La. 12/6/96), 684 So.2d 930; Torrejon v. *571 Mobil, 2003-1426 (La. App 4th Cir. 6/2/04), 876 So.2d 877, 892-893, writ denied, 2004-1660 (La.9/24/04), 882 So.2d 1125; and Hennegan v. Cooper/T. Smith Stevedoring Co., 2002-0282 (La.App. 4th Cir. 12/30/02), 837 So.2d 96, 103, writ denied, 2003-0316 (La.4/21/03), 841 So.2d 794.

. Although the plaintiffs filed an application for supervisory writs with regard to the trial court's ruling granting the defendants' motion for a Daubert hearing on Sherwin-Williams’ motion to strike, which this court denied, on appeal, the plaintiffs did not assign error to the trial court’s ruling in this regard. Notably, the prior denial of a supervisory writ application does not preclude reconsideration of the issue on appeal, nor does it prevent the appellate court from reaching a different conclusion on the issue. State v. Tassin, 11-1144 (La.App. 5th Cir 12/19/13), 129 So.3d 1235, 1264, writ denied, 2014-0284, 2014-0287 (La.9/19/14), 148 So.3d 950, citing State v. Castleberry, 98-1388 (La.4/13/99), 758 So.2d 749, 755, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999). Reconsideration of a prior ruling is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. Tassin, 129 So.3d at 1264.
In reviewing the merits of defendants’ motion to set a Daubert hearing and the trial court’s reasons for granting the defendants’ motion, in conjunction with our review of the entire record on appeal, we note that both the defendants’ and the trial court have misinterpreted, in part, our decision in Robertson III. In Robertson III, we determined that the trial court legally erred in striking the testimony of Dr. Mark because it failed to conduct a Dau-bert analysis before limiting Dr. Mark's testimony. Therefore, this court, on de novo review of the motion to strike, conducted a Daubert analysis of the reliability of Dr. Mark’s opinion and reversed the judgment of the trial, court. Robertson III, 77 So.3d at 355-359. This Court did not remand for another contradictory Daubert hearing with live testimony, and did not intend to give Sher-win-Williams (or the other defendants) a “second bite at the apple” to meet its burden of proof on the motion to strike when it failed to meet that burden when the motion was initially heard. However, considering our decision to find merit to the plaintiffs' appeal herein and to reverse the judgment of the trial court rendered after the Daubert hearing, we cannot say that the trial court's decision to set a Daubert hearing adversely affected the plaintiffs' rights or ultimately produced unjust results. Thus, the trial court’s ruling on this motion does not warrant reconsideration by this court. See Tassin, 129 So.3d at 1264; cf. Brooks v. Maggio, 34,889 (La.App. 2nd Cir. 8/22/01), 793 So.2d 481, 483 (the misinterpretation of the appellate court's prior ruling by both the trial court and the parties deprived a litigant of the opportunity to pursue an action and appeared to result in the dismissal of the action and assertion of an exception, and thus, vacating the trial court's judgment and remanding the matter was warranted); ANR *572 Pipeline Company v. Louisiana Tax Commission, 2007-2282 (La.App. 1st Cir. 10/17/08), 997 So.2d 105, 110-111, writ denied, 2009-0025 (La.3/6/09), 3 So.3d 484 (the misinterpretation of the appellate court's prior ruling by the trial court formed the basis of a preliminary injunction, and thus, the preliminary injunction was issued in error and had to be vacated and the matter remanded for further proceedings).

. See La. C.C.P. art. 1425(F)(2).

. In Robertson III, 77 So.3d at 359, we noted that epidemiological evidence was not required to establish causation of an individual’s disease.

. We note that at the Daubert hearing, the defendants also offered the testimony of Dr. Dyson, Dr. Dyson identified the four factors to take into account in risk assessment for meso-thelioma insofar as a valid methodology from an industrial hygienist: (1) the extent of exposure measured in terms of dose (explained as the intensity of the exposure (from reported literature and work history)) reduced by respiratory protection multiplied by the duration of the exposure (from the work history provided by the individual); (2) the fiber type (amphiboles or chrysotile) and its potency with respect to mesothelioma; (3) the dimensions of the fiber and whether it was respira-ble or not or able to be cleared from the lungs; and (4) latency of residence time in the lung. '
Unfortunately, Dr. Dyson did not read Dr. Mark’s affidavit or his deposition testimony, and was not present in court when Dr., Mark testified at the Daubert hearing. Thus, Dr. Dyson could not criticize or provide an opinion about Dr. Mark's methodology in this case because he was not aware of the methodology and did not know how Dr. Mark applied various factors. Rather, Dr. Dyson stated that his role was simply to describe an approach that an industrial hygienist would use in assessing risk. Thus, Dr. Dyson’s testimony was not particularly helpful to the Daubert inquiry herein as Dr. Dyson's testimony did not specifically tie into the facts of this particular case and did not establish whether Dr. Mark's opinion on causation in this case was unreliable. Nevertheless, we recognize that *579 during cross-examination, Dr. Dyson admitted that in evaluating the relative contribution of an exposure to asbestos to mesothelioma, it was proper to evaluate or consider a number of different factors including, but not limited to the nature of the exposure, the level of exposure, and the duration of exposure, whether a product gives off respirable asbestos fibers, whether the person was close or far from the source of fiber release, how frequently the exposure took place, whether respiratory protection was used, the chemistry and physics of the asbestos fibers, the patho-physiology of breathing, the movement of asbestos fibers in the lung, and the molecular pathology of tumor development, all of which the testimony established was part of the methodology followed by Dr. Mark.

. The plaintiffs also relied on a document entitled “Painting Systems 1972,” Harris Robertson's Surgical Pathology Report” for a procedure on June 30, 2004, and Harris Robertson’s certificate of death. However, these documents were not affidavits or sworn to in any way, were not certified or attached to an affidavit, and therefore, had no evidentiary value on a motion for summary judgment. Accordingly, we find those documents are not proper summary judgment evidence and will not be considered by this court on de novo review. See Bunge North America, Inc. v. Board of Commerce & Industry and Louisiana Department of Economic Development, 2007-1746 (La.App. 1st Cir.5/2/08), 991 So.2d 511, 527, writ denied, 2008-1594 (La. 11/21/08), 996 So.2d 1106; see also Pecue v. Plantation Management Co., L.L.C., 2013-0977, p. 3 n. 5 and n. 7, and p. 5 n. 12 (La.App. 1st Cir.2/18/14), 2014 WL 667489 (unpublished), writ denied, 2014-0586 (La.4/25/14), 138 So.3d 1232.
In addition, the plaintiffs offered deposition testimony of three corporate representatives of Sherwin-Williams, Peter Sedlak, Elizabeth Agnes Gilbert, and Dwight Cohagen, all of which were from unrelated asbestos litigation and Sherwin-Williams answers to interrogatories in unrelated asbestos litigation. Depositions in other proceedings can be used for "other purposes,” such as impeachment; however, depositions in other proceedings are "collateral depositions” and should not be used or considered in summary judgments under La. C.C.P. art. 966(B). Edwards v. Larose Scrap & Salvage, Inc., 2010-0596 (La. App. 3rd Cir. 12/8/10), 52 So.3d 1009, 1012; Bell v. Gold Rush Casino, 2004-1123 (La.App. 3rd Cir. 2/2/05), 893 So.2d 969, 973. Accordingly, we will not consider the collateral depositions or collateral answers to interrogato *582 ries offered by the plaintiffs in opposition to the motion for summary judgment on de novo review herein.

. In Robertson III, 77 So.3d at 352, with regard to this evidence, we determined that the plaintiffs ha[d] put forth sufficient evidence establishing genuine issues of material fact as to whether "Gold Bond” was an asbestos-containing joint compound, whether Harris Robertson routinely and regularly used and inhaled (and was thus significantly exposed to) the asbestos-containing "Gold Bond” joint compound in his diywall finishing work, and whether Harris Robertson (or other people for or with whom he worked) purchased asbestos-containing joint compound from Sherwin-Williams’ stores.

. As in Robertson III, 77 So.3d at 348-349, it appears that trial court erroneously considered, in part, an issue that was not raised in the motion for summary judgment. See La. C.C.P. art. 966(E). The issue raised in Sher-win-Williams’ motion for summary judgment pertained to whether asbestos from products purchased at Sherwin-Williams' stores was a substantial contributing factor in causing Harris Robertson’s mesothelioma — not whether Harris Robertson had significant exposure to asbestos containing products of Sherwin-Williams. Furthermore, as previously set forth, in Robertson III, 77 So.3d at 352, this court clearly held that the plaintiffs had put forth sufficient evidence establishing genuine issues of material fact such “that Sherwin-Williams was not entitled to summary judgment on the issue of whether Harris Robertson had substantial exposure from products bought at Sherwin-Williams owned stores.” Nevertheless, since summary judgments are reviewed on appeal de novo, we will review Sherwin-Williams’ motion for summary judgment as to the issues set forth in that motion, Robertson III, 77 So.3d at 349.