## NOT DESIGNATED FOR PUBLICATION

## STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## 2018 CA 0592

CERTAIN UNDERWRITERS AT LLOYD'S LONDON AND
CERTAIN INSURANCE COMPANIES SUBSCRIBING TO POLICY
NOS. JHB-CJP-1903(A), B0509M0334412, BO180E122624, ET AL.

## VERSUS

UNITED STATES STEEL CORPORATION AND UNITED STATES
TUBULAR PRODUCTS, INC.

*DATE OF JUDGMENT:*  SEP 2 7 2019

ON APPEAL FROM THE SEVENTEENTH JUDICIAL DISTRICT COURT
NUMBER 125577, DIVISION A, PARISH OF LAFOURCHE
STATE OF LOUISIANA

HONORABLE JOHN E. LEBLANC, JUDGE

\* \* \* \* \* \*

James Clifton Hall, III
George H. Lugin, IV
Karen Lynn Rosenberg
William P. Maines
Samuel J. Dolan
Houston, Texas

Joseph L. Waitz, Jr.
Houma, Louisiana

Loretta G. Mince
Jeanette A. Donnelly
Rebecca Sha
Kathryn J. Johnson
New Orleans, Louisiana

Counsel for Plaintiffs-Appellants
Certain Underwriters at Lloyd's
London and Certain Insurance
Companies Subscribing to Policy Nos.
JHB-CJP-1903(A), B0509M0334412,
B0180E122624, Manti Exploration,
LP Shoreline Southwest, LLC, Ankor
E & P Holding Corporation, Dune
Properties, Inc., Manti Equity Partners,
LP, Manti, LP, Manti Exploration and
Production, Inc., Manti Exploration
Operating, LLC, San Isidro
Development Co., LC, Leevill West
Energy, LLC, CC Bay, LLC, Winn
Exploration Company, Inc., C.
Douglas Jamba, LLC and D & C
Energy Resources, Inc.

*Welch Jr. dissents and assigns reasons*

Christopher H. Riviere
Todd M. Magee
Thibodaux, Louisiana

Ronald G. Franklin
Houston, Texas

Counsel for Defendants-Appellees
United States Steel Corporation and
United States Steel Tubular Products,
Inc.

\* \* \* \* \* \*

BEFORE: WELCH, CHUTZ, AND LANIER, JJ.

**Disposition: AFFIRMED.**

**CHUTZ, J.**

In this products liability case, the plaintiffs appeal a summary judgment dismissing their products liability claims against defendants, as well as a ruling of the district court granting defendants' motion in limine to exclude the opinion testimony of two of plaintiffs' expert witnesses. For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

In July 2013, a blowout occurred in an oil well being drilled by Manti Exploration Operating, LLC ("Manti") in Lafourche Parish. The blowout resulted from a perforation in a $11^{7/8}$ inch metal casing pipe located 8,729 feet below ground. As a result of the blowout, Manti eventually abandoned the well after plugging it with cement. Before the well was plugged, a caliper tool was run down the wellbore to generate a caliper[1] log.

On July 24, 2014, Manti, Certain Underwriters at Lloyd's London,[2] et al., and numerous other plaintiffs[3] (collectively "Certain Underwriters") filed a suit for damages against United States Steel Corporation and United States Steel Tubular Products, Inc. (collectively "U.S. Steel"). Certain Underwriters alleged the blowout was caused by a defect in a casing pipe manufactured by U.S. Steel.

Casing pipe from multiple manufacturers, including U.S. Steel, was used in the wellbore. Two different types of casing pipe were used, consisting of seamless

---

[1] The caliper tool used in this case is a 60-finger device used to detect small changes in the interior surface condition of tubing or casing.

[2] According to the petition, Certain Underwriters are "underwriting syndicates at Lloyd's and insurance companies" that provide insurance coverage for the losses incurred as a result of the blowout and, therefore, are subrogated, in whole or in part, to the claims of the Interest Owners of the Manti well.

[3] The additional plaintiffs were the following "Interest Owners" in the Manti well: Manti Exploration, LP; Shoreline Southeast, LLC; Ankor E&P Holdings Corporation; Dune Properties, Inc.; Manti Equity Partners, LP; Manti, LP; Manti Exploration and Production, Inc.; Manti Operating Company; San Isidro Development Company, LC; Leeville West Entergy, LLC; CC Bay, LLC; Winn Exploration Company, Inc.; C. Douglas Jamba, LLC; and D&C Energy Resources, Inc.

pipe and ERW ("Electric Resistance Welded") pipe. ERW pipe contains a seam where the sheet metal is welded together down the length of the pipe.

In order to support its claims against U.S. Steel, Certain Underwriters relied on the opinions of two metallurgists, Simon Bellemare and Thomas Eagar (collectively "the experts") to meet its burden of proving a defective ERW casing pipe (joint #140) manufactured by U.S. Steel caused preferential wear that led to the blowout in the Manti wellbore. The experts issued a joint report on June 3, 2015, and Drs. Bellemare and Eagar each issued a supplemental report on November 30, 2016.

In their reports, the experts opined that a manufacturing defect, consisting of "a step, 0.04 to 0.08 [inch] in height, on the interior surface of that particular casing [joint #140]" was the cause of the preferential wear that led to the casing pipe perforation. Specifically, they concluded the step at joint #140 caused the tool joint in the drill string to become fixed or stuck on a vertical line inside the casing pipe, causing preferential wear that reduced the thickness of the steel in successive casing pipe segments below joint #140, ultimately leading to a perforation in the pipe. The experts further opined that a defect such as the step could not occur in seamless casing pipe. On that basis, they concluded the step must have occurred in an ERW casing pipe. U.S. Steel admitted all the ERW casing pipe used in the wellbore was U.S. Steel product.

On June 9, 2017, U.S. Steel filed a motion in limine to exclude the experts' testimony regarding several opinions, including their opinion on causation, on the following grounds: they were unqualified to render opinions on causation since they were not qualified in the field of petroleum engineering; their methodology was unreliable; and, their opinions were speculative, based on insufficient data, and failed to take adequate account of alternate explanations for the casing pipe wear that led to the blowout. A hearing on the motion in limine was held on June 28,

4

2017. Neither Dr. Bellemare nor Dr. Eagar testified at the hearing, although their original and supplemental reports and excerpts from their respective depositions were introduced into evidence. At the conclusion of the hearing, the district court granted U.S. Steel's motion to exclude Drs. Bellemare and Eagar's testimony. The district court signed a written order in accordance with his ruling on July 7, 2017.

U.S. Steel subsequently filed a motion for summary judgment, arguing Certain Underwriters would be unable to prove essential elements of their products liability claim without the testimony of the experts. Following a hearing, the district court agreed with U.S. Steel's position and granted summary judgment dismissing Certain Underwriters' damage claims. In its written reasons for judgment, the district court concluded Certain Underwriters failed to present any admissible evidence that a defect existed in casing pipe manufactured by U.S. Steel (existence of defect), the alleged defect in the casing pipe caused the Manti well blowout (causation), or that U.S. Steel manufactured the allegedly defective casing pipe (identification as U.S. Steel product). Certain Underwriters has now appealed, raising two assignments of error.

## ASSIGNMENTS OF ERROR

1. The district court erred by failing to apply the correct legal standards on expert qualification and reliability, and by unilaterally weighing the experts' opinion.[4]

2. The district court erred in granting summary judgment as a result of its erroneous decision to exclude the testimony of Certain Underwriters' experts.

---

[4] The district court's grant of U.S. Steel's motion in limine is interlocutory in nature and generally not appealable. However, when an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings, in addition to review of the final judgment. *Cajun Constructors, Inc. v. EcoProduct Solutions, LP*, 15-0049 (La. App. 1st Cir. 9/18/15), 182 So.3d 149, 155, writ denied, 15-1908 (La. 11/20/15), 180 So.3d 1287.

## APPLICABLE LAW

*Admissibility of Expert Testimony*:

The standard for admissibility of expert testimony established by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed b.2d 469 (1993), is now codified in La. C.E. art. article 702. *Lee v. Louisiana Board of Trustees for State Colleges*, 17-1433 (La. App. 1st Cir. 3/13/19), ____ So.3d ____, 2019 WL 1198551 at *6. Article 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

Under *Daubert*, the trial court is charged with the duty of performing a gatekeeping function to ensure that the expert testimony is not only relevant, but also reliable.[5] To ensure reliability, *Daubert* requires an expert's opinions to be grounded in methods and procedures of science, rather than subjective beliefs or unsupported speculation. *Devall v. Baton Rouge Fire Department*, 07-0156 (La. App. 1st Cir. 11/2/07), 979 So.2d 500, 502. The factual basis for an expert's opinion

---

[5] In fulfilling its gatekeeper role, the trial court may consider various factors, including: (1) the testability or refutability of the expert's theory or technique; (2) whether the technique has been subjected to peer review and/or publication; (3) the known or potential rate of error; and (4) whether the technique or methodology is generally accepted by the relevant scientific community. The *Daubert* approach, however, is a flexible one, and the list of factors is not exclusive. *Daubert*, 509 U.S. at 593-95, 113 S.Ct. at 2796-97; *Robertson v. Doug Ashy Building Materials, Inc.*, 14-0141 (La. App. 1st Cir. 12/23/14), 168 So.3d 556, 567, writ denied, 15-0365 (La. 4/24/15), 169 So.3d 364.

determines the reliability of the testimony. *Lee*, ____ So.3d at ____, 2019 WL 1198551 at *7.

In *Cheairs v. State ex rel. Department of Transportation and Development*, 03-0680 (La. 12/3/03), 861 So.2d 536, 542, the Louisiana Supreme Court adopted the following test for determining whether the admission of expert testimony is proper: (1) Is the expert qualified to testify competently regarding the matters he intends to address?; (2) Is the methodology by which the expert reaches his conclusions sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*?; (3) Will the testimony assist the trier-of-fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue? Generally, the test of competency of an expert is the expert's knowledge of the subject about which he is called upon to express an opinion. *Lee*, ____ So.3d at ____, 2019 WL 1198551 at *7. Ultimately, the trial court must determine whether the expert testimony has a reliable basis in the knowledge and experience of the relevant discipline. *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796; *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999).

Moreover, there is a crucial difference between questioning the methodology employed by an expert witness and questioning the application of that methodology or the ultimate conclusions derived by the expert from that application. *Lee*, ____ So.3d at ____, 2019 WL 1198551 at *7; *Robertson*, 168 So.3d at 567. A trial court may not decide what expert evidence to admit based on its own credibility determinations and resulting resolution of disagreements between the experts. *Lee*, ____ So.3d at ____, 2019 WL 1198551 at *7.

A trial court is accorded broad discretion in determining who should be permitted to testify as an expert. Comment (d) (1988) to La. C.E. art. 702; *Cheairs*, 861 So.2d at 541. An appellate court should not disturb a trial court's ruling on the

7

admissibility of expert opinion evidence absent an abuse of discretion. *Cheairs*, 861 So.2d at 541; *MSOF Corporation v. Exxon Corporation*, 04-0988 (La. App. 1st Cir. 12/22/05), 934 So.2d 708, 717, <u>writ denied</u>, 06-1669 (La. 10/6/06), 938 So.2d 78.

*Motion for Summary Judgment*:

A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. A summary judgment is reviewed on appeal *de novo*, with the appellate court using the same criteria that govern the district court's determination of whether summary judgment is appropriate; *i.e.*, whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3); *Schultz v. Guoth*, 10-0343 (La. 1/19/11), 57 So.3d 1002, 1005-06.

Louisiana Code of Civil Procedure article 966(D)(1) places the initial burden of producing evidence at the hearing on the motion for summary judgment on the mover, who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent's case. Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a genuine issue of material fact dispute mandates the granting of the motion. *Schultz*, 57 So.3d at 1006.

**MOTION IN LIMINE**

On appeal, Certain Underwriters argues that in ruling on the motion in limine, the district court failed to properly exercise its role as a gatekeeper and instead weighed the evidence to conclude it did not agree with the experts' opinions. Essentially, Certain Underwrites contends the district court improperly questioned the experts' conclusions rather than the methodology they used in reaching their conclusions. Certain Underwriters argues this court, therefore, should apply a *de novo* standard of review on appeal since the district court applied the wrong legal standard in ruling on the motion in limine.

8

At the conclusion of the hearing on the motion in limine, the district court gave oral reasons for its ruling. Our review of the district court's reasons indicates the court's ruling was based primarily on concerns about the reliability of the experts' opinions. One of the district court's particular concerns was the experts' lack of experience and knowledge in the area of drilling operations. The district court also expressed concern about the reliability of the experts' opinions because in formulating their conclusions, they did not consider areas of the wellbore where there was damage to the casing pipe other than the area in immediate proximity to where the perforation in the casing pipe occurred. The district court specifically stated it was not basing its decision on the disagreement between the various experts, but on the fact that it had not been shown that the experts' "methods in reaching their conclusions [were] reliable, testable, provable and consistent with some scientific method beyond a guess – a speculation."

Our review of the district court's reasons indicates the ruling was based on concerns regarding the reliability of the experts' opinions and methodology, rather than on disagreement with the conclusions the experts reached. We find no legal error by the district court in its ruling on the motion in limine. Accordingly, we will review the ruling under an abuse of discretion standard. See *Cheairs*, 861 So.2d at 541; *MSOF Corporation*, 934 So.2d at 717.

The parties do not dispute the perforation in the casing pipe that led to the blowout was caused by substantial wear. The disputed issue is what caused the casing pipe wear to occur. Through its motion in limine, U.S. Steel sought to exclude testimony from the experts as to their opinion that preferential wear to the casing pipe was caused by the drill string becoming fixed on the alleged step. Certain Underwriters intended to present this testimony to establish the essential element of causation.

9

Initially, we note both experts are metallurgist who are faculty members at the Massachusetts Institute of Technology and have extensive experience in metal failure analysis. Dr. Eagar also has extensive knowledge and experience regarding the manufacture of steel piping. U.S. Steel does not challenge the experts' qualifications in the fields of metallurgy and materials engineering. Rather, the pertinent issue is whether the experts' experience and expertise qualified them to render a reliable opinion on the cause of the wear that occurred in the wellbore casing pipe. Solely for the purpose of considering this issue, we will assume the step alleged by the experts actually existed.[6]

Based on our review of the evidence presented, we find no abuse of discretion in the district court's exclusion of the experts' testimony with respect to their opinion on the cause of the casing pipe wear that led to the perforation. Following the hearing on the motion in limine, the district court concluded the experts' opinion on causation was unreliable and speculative due to their lack of expertise and experience in drilling operations.

The record supports the district court's conclusion. For instance, even though a large portion of the experts' opinion on causation was based on caliper log data,

---

[6] U.S. Steel also challenged the methodology employed by the experts in reaching their opinions as to the existence and size of the alleged step. As previously noted, we have assumed the step existed as opined by the experts for the sake of argument. Thus, we pretermit consideration of whether the evidence established the experts' opinions as to the existence and size of the step were based on a methodology generally accepted by the relevant scientific community. However, we note the following evidence was presented at the hearing on the motion in limine.

The experts' June 3, 2015 report states the experts performed a regression analysis on the caliper log data to determine the size of the alleged step on joint #140 and the adjacent joints. At another point in the June 3, 2015 report, the experts state they confirmed the existence of a step anomaly on joint #140 and the absence of a step on the adjacent joints of casing pipe "[b]y regression analysis." The report contains little explanation of how the experts performed the regression analysis.

U.S. Steel presented the testimony of Dr. John Olivas, a mechanical engineer and material scientist who formerly worked for NASA. Dr. Olivas testified the experts did not "use a scientifically known reliable method" in reaching their opinions. Dr. Olivas further stated that regression analysis can take a number of different forms, and in his entire time in the engineering field (over twenty years), he has never seen a regression analysis used to opine on such as small feature as the alleged step (0.04 to 0.08 inch).

the experts failed to consider the accuracy rating of the caliper tool in reaching their opinions. The manufacturer specifications for the accuracy of the caliper tool was plus or minus 0.03 inch. Therefore, when the accuracy rating of the caliper tool is considered, the actual size of the step could have been as small as 0.01 to 0.05 inch rather than 0.04 to 0.08 inch as opined by the experts.

Certain Underwriters strenuously argues it is not the accuracy rating of the caliper tool that is important, but its resolution rating.[7] In his deposition, Dr. Bellemare specifically testified the experts' analysis was based on the resolution of the caliper tool as opposed to its accuracy. Certain Underwriters contends that while the caliper tool's accuracy controls in determining the correct diameter of the casing pipe, its resolution controls in determining "whether there is any change in the internal diameter of the casing from one point on the interior surface to an immediately adjacent point." Further, Certain Underwriters points out the measurement of 0.04 to 0.08 inch is well within the 0.005 inch resolution rating of the caliper tool used.

We believe the experts' exclusive reliance on the caliper tool's resolution, while ignoring its accuracy rating, casts doubt on the reliability of their opinion on causation. It appears the experts should have considered both the caliper tool's accuracy rating and its resolution capacity in formulating their opinions. The experts opined the size of the step inside the casing pipe was 0.04 to 0.08 inch in size. In their June 3, 2015 report, the experts state *"[b]ased on the step size and the geometry of the contact, we find that the step on joint #140 was sufficient to cause the initiation and continuation of preferential wear."* (Emphasis added.) When the caliper tool's accuracy rating is considered, however, it is possible the step was actually only 0.01

---

[7] The accuracy of a measuring device is its "degree of conformity to some recognized standard value." *Webster's Third New International Dictionary* (3rd ed. 1961). The resolution of a measuring device is the smallest number that it can measure or record.

11

to 0.05 inch in size rather than 0.04 to 0.08 inch. Because the experts' analysis and calculations did not include the possibility the step was smaller than they postulated, the reliability of their opinion that the drill string could have and, in fact, did become fixed on the step, leading to preferential wear, is called into question. The experts' analysis failed to exclude the possibility that if the step had been as small as 0.01 to 0.05 inch, the drill string might not have become fixed on the smaller step.

Moreover, it appears the experts not only failed to consider the caliper tool's accuracy rating, but also were unfamiliar in general with the operation of the particular caliper tool used. The record shows that *after* the experts issued the June 3, 2015 report, several emails were sent by an employee of Dr. Bellemare's consulting firm to the manufacturer of the caliper tool seeking information on how the caliper tool functioned. The employee inquired in one email whether the caliper tool "can rotate while moving up a wellbore and taking measurements" and, if so, whether the rotation was "accounted for and how." The emails demonstrate a lack of knowledge as to the operation and capacities of the caliper tool as utilized in the wellbore.

Finally, we agree with the district court that the experts' lack of experience or knowledge of drilling operations also affected the reliability of their opinion on causation. The experts' experience with drilling operations was limited. Dr. Eagar did not claim to have expertise in drilling operations. Additionally, Certain Underwriters' drilling expert, Gregory Sones, gave the following deposition testimony highlighting Dr. Bellemare's lack of even basis knowledge concerning drilling operations.

> [Dr. Bellemare] doesn't know a lot about – he's learning as we go, but *he doesn't know a lot about the tools, the function of drilling a well.*

> … I spend a lot of time explaining what, say, a bid is. … I'm just using it as an illustration.

... So, [Dr.] Bellemare has a pretty good vocabulary and he has a pretty good definition of a lot of those things that we use. So, if I made a list of all the things that we use in the oil patch, he could probably give me a definition of most of them *but he doesn't know how you apply them.*

... So, a lot of our discussions were related to what was going on, on the well. How were they drilling? What is drilling? What is mud? How does that work? Were they turning the drill string and how were they doing that? How fast? What is this weight-on-bit business? You know, all these kind of things that give him the understanding of what the operations were in the well.

[Emphasis added.]

The experts' opinion on causation was based on their theory that the drill string became fixed on the step, initiating preferential wear that led to the perforation in the casing pipe. Therefore, the manner in which the drill string moved inside the casing pipe obviously was a matter of critical importance. Dr. Eagar admitted in his deposition that the manner of the movement within the casing pipe affected the analysis of whether the step caused the drill string to become stuck, thereby leading to preferential wear.

When the experts were questioned during their depositions concerning how the drill string moved, Dr. Eagar simply stated "it precesses around the ... inside of the casing," and Dr. Bellemare indicated the drill string oscillated around the edge of the casing. However, Mr. Sones, Certain Underwriter's drilling expert, indicated the movement of the drill string inside the casing pipe is much more complicated. According to his deposition testimony, the drill string not only oscillates around the casing but also moves up and down. Additionally, he testified the "oscillation may be completely symmetrical, meaning it follows the ID of the casing string all the way around, or it may randomly move" or "jump across." Mr. Sones testified he told the experts his opinion in this case was that "the drill string was moving around in the drill – inside the casing in a random manner." Thus, a review of the evidence indicates the experts lacked a complete understanding of the drill string's

movements, as those movements were described by Certain Underwriters' own drilling expert.

We believe the district court correctly concluded specialized knowledge of drilling operations was necessary for the experts to render reliable opinions on whether the drill string could have become fixed on such a small fixture within the wellbore as the alleged step, as well as to eliminate possible alternative causes for the wear in the casing pipe. A reliable opinion on causation and the exclusion of possible alternate causes, including normal drilling operations, required consideration and understanding of a multitude of specialized factors. These factors include how the drill string operated and moved within the casing pipe, drill string tension, torque, hook load, tool joint conditions, the lubricity of the drilling mud, the temperature of the fluids, the products in the fluids, the speed at which the drill string is turning, the drill string weight, rotating speed, rotating time, dogleg severity, and the angle of drilling.

From the experts' reports and deposition testimony, it is clear they relied on the drilling expertise of Mr. Sones in matters related to drilling due to their own lack of experience and expertise in such matters. In their June 3, 2015 report, the experts made little effort to eliminate possible alternate causes for the casing pipe wear that could have resulted from the drilling operations. Dr. Bellemare's supplemental report of November 30, 2016, contains a single paragraph discussing the elimination of possible alternate causes for the casing pipe wear. The report states the experts eliminated the possibility the casing pipe wear could have occurred without the step for several reasons.[8] However, a review of the reasons reveals they are based on

---

[8] The enumerated reasons were: how infrequently preferential wear has been observed in this type situation; the data showed the wear started at a fixed point on joint #140 then started drifting around the circumference; the drilling operation would have caused the contact orientation to change over time because of the wobbling of a long, slender string subjected to torque and variable fiction; and the wellbore inclination was not sufficient to cause a preferential wear profile.

14

experience and expertise in drilling operations the experts do not possess. This fact, as well as the experts' reliance on Mr. Sones' opinions, is illustrated by one of the reasons enumerated by Dr. Bellemare for eliminating possible alternate causes, which was that the "wellbore inclination was not sufficient to cause a preferential wear profile *according to Mr. Sones.*" (Emphasis added.) Moreover, in his deposition, Dr. Bellemare admitted he did not analyze whether the casing pipe wear could have occurred in the absence of the alleged step.

Under Article 702, expert testimony must rise to a threshold level of reliability in order to be admissible. See *Lee*, ____ So.3d at ____, 2019 WL 1198551 at *6; *Jackson v. Suazo-Vasquez*, 12-1377 (La. App. 1st Cir. 4/26/13), 116 So.3d 773, 778. In this case, the district court determined the experts lacked a reliable basis grounded in knowledge and experience of drilling operations to render an opinion on the cause of the casing pipe wear. Because we agree the experts' lack of knowledge and experience in drilling operations precluded them from reliably opining on the cause of the wear in the casing pipe that led to the perforation in the pipe or from eliminating possible alternate causes for the casing pipe wear, we find no error in the district court's exclusion of the experts' opinion on causation.[9]

## MOTION FOR SUMMARY JUDGMENT

Certain Underwriters argues the district court improperly granted summary judgment predicated on its erroneous ruling excluding the experts' testimony. Certain Underwriters further contends the district court would not have granted the summary judgment dismissing its claim if the court had not erroneously excluded the experts' testimony.

---

[9] We pretermit consideration of whether the district court ruling was erroneous with respect to the experts' opinions other than causation. We believe the district court's ruling excluding the experts' opinion on causation is dispositive of U.S. Steel's motion for summary judgment, making it unnecessary to consider the admissibility of the experts' other opinions.

15

The Louisiana Products Liability Act (LPLA) establishes the exclusive theories of liability for manufacturers for damages caused by their products. La. R.S. 9:2800.52. One of the essential elements a plaintiff must prove under the LPLA is that his damages were caused by the manufacturer's defective product. See La. R.S. 9:2800.54A; *Jack v. Alberto-Culver USA, Inc.*, 06-1883 (La. 2/22/07), 949 So.2d 1256, 1258.

Thus, in order to succeed in its claim, Certain Underwriters must prove its damages were caused by a defective U.S. Steel casing pipe. U.S. Steel pointed out the lack of factual support to prove this causation element of Certain Underwriters' claim. At that point, the burden shifted to Certain Underwriters to produce factual support sufficient to establish the existence of a genuine issue of material fact regarding causation. See La. C.C.P. art. 966(D)(1); *Schultz*, 57 So.3d at 1006. Certain Underwriters failed to present admissible evidence sufficient to meet this burden.

In the absence of the experts' opinion that the drill string became fixed on the alleged step, causing wear in the casing pipe that led to the perforation in the pipe, Certain Underwriters presented insufficient evidence to raise a genuine issue of material fact regarding causation. Therefore, the district court properly granted summary judgment dismissing Certain Underwriters' damage claims against U.S. Steel. See *Schultz*, 57 So.3d at 1006.

## CONCLUSION

For the above reasons, we affirm both the district court's January 29, 2018 summary judgment dismissing the damage claims of plaintiffs, Certain Underwriters, against defendants, U.S. Steel, and the district court's July 7, 2017 ruling granting U.S. Steel's motion in limine. All costs of this appeal are cast on Certain Underwriters.

**AFFIRMED.**

CERTAIN UNDERWRITERS                    2018 CA 0592
AT LLOYD'S LONDON

                                        FIRST CIRCUIT

VERSUS
                                        COURT OF APPEAL

UNITED STATES STEEL                     STATE OF LOUISIANA
CORPORATION


**Welch, J. dissenting.**

I respectfully disagree with the majority opinion in this matter. On the motion in limine, U.S. Steel failed to prove that the opinions of Simon Bellemare and Thomas Eager ("the experts") on causation in this case were unreliable. See **Robertson v. Doug Ashy Bldg. Materials, Inc.**, 2010-1552 (La. App. 1st Cir. 10/4/11), 77 So.3d 339, 359, writs denied, 2011-2468, 2011-2430 (La. 1/13/12), 77 So.2d 972, 973, writs not considered, 2011-2433, 2011-2432 (La. 1/13/12), 77 So.3d 973, 974 (on a defendant's motion seeking to exclude the plaintiffs' expert's opinion on causation under **Daubert**, the defendant must prove that the expert's opinion is unreliable). Thus, the trial court abused its discretion in granting the motion in limine, and further, it erred in granting U.S. Steel's motion for summary judgment and in dismissing the plaintiffs' claims against U.S. Steel. Therefore, I would reverse the July 7, 2017 and January 29, 2018 judgments of the trial court.

Although the majority concludes that the experts' lack of knowledge and experience in drilling operations precluded them from reliably opining on the cause of the wear in the casing pipe that led to the perforation in the pipe or from eliminating possible alternate causes for the casing pipe wear, neither the majority's nor the trial court's conclusions are based on the validity of the experts' methodology, but rather go to the weight of the evidence and their qualifications, which are issues that do not bring **Daubert** into play. See **MSOF Corporation v.**

**Exxon Corporation**, 2004-0988 (La. App. 1st Cir. 12/22/05), 934 So.2d 708, 718, writ denied, 2006-1669 (La. 10/6/06), 938 So.2d 78.

For instance, the majority states that "[w]e believe the expert's exclusive reliance on the caliper tool's resolution, while ignoring its accuracy rating, casts doubt on the reliability of their opinion on causation" and that "[i]t appears the experts should have considered both the caliper tool's accuracy rating and its resolution capacity in formulating their opinions." However, the record does not establish—through expert testimony or other evidence presented on behalf of U.S. Steel—that consideration of both the caliper tool's accuracy rating and its resolution capacity must be considered in formulating an expert opinion or for an expert's methodology to be valid. Furthermore, to the extent that the experts should have relied on both, this factor affects only the weight to be afforded the experts conclusions and may serve as a basis for attack by U.S. Steel on cross-examination at trial, but it does not make their opinion evidence unreliable or inadmissible under **Daubert**. See **MSOF Corp.**, 934 So.2d at 720.

In addition, the majority also finds that "the experts' lack of experience or knowledge of drilling operations also affected the reliability of their opinion on causation." However, it is well-settled that **Daubert** concerns the admissibility of the expert's opinion and not his qualification as an expert in the area tendered. *Id.* at 718. To the extent that the experts had to rely on the drilling expertise of Mr. Sonnes in matters related to drilling, it is also well-settled that an expert may provide testimony based on information obtained from others (including other experts) and the character of the evidence upon which an expert bases an opinion affects only the weight to be afforded that expert's conclusion—not its admissibility under **Daubert**. See **MSOF Corp.**, 934 So.2d at 720.

Although a trial court is afforded broad discretion in determining whether expert testimony is reliable under **Daubert**, that discretion is premised upon an

understanding that **Daubert** is intended to protect the sanctity of the fact finding process by assessing the validity of the methodology employed by an expert and not the expert's application of that methodology or his conclusions derived from the application of that methodology. **Robertson v. Doug Ashy Building Materials, Inc.**, 2014-0141 (La. App. 1st Cir. 12/23/14), 168 So.3d 556, 579, writ denied, 2015-0365 (La. 4/24/15), 169 So.3d 364. Issues involving the credibility of an expert, the weight to be given to the expert's testimony, and the resolution of conflicts between expert opinion testimony are to be assessed at trial by the trier of fact. *Id.*

In this case, in excluding the experts' opinion, both the majority and the trial court's conclusions are based on objections that U.S. Steel had with regard to the causation opinion of the experts, which did not relate to their methodology, but rather, involved their conclusions derived from applying their methodology to the facts of the case, and thus, pertained to their credibility and the weight of their opinion testimony. The evidence offered established that the experts methodology—the use of caliper log data—is standard practice and that the experts used a well-known and peer-reviewed adhesive wear equation to prove that a step in the size range identified on the caliper log could cause the preferential wear and resulting casing failure. Thus, their opinion was thus reliable under the standards set forth in **Daubert**. Indeed, the defendants own experts acknowledged that the regression analysis employed by the experts was reliable. Therefore, the trial court abused its discretion in granting U.S. Steel's motion in limine and I would reverse the trial court's July 7, 2017 judgment in this regard.

Furthermore, when the expert evidence wrongfully excluded by the trial court is considered in reviewing U.S. Steel's motion for summary judgment, Certain Underwriters met is burden of producing factual support sufficient to establish the existence of a genuine issue of material fact regarding causation. As

such, summary judgment was improvidently granted and I would reverse the January 29, 2018 judgment of the trial court.

Thus, I respectfully dissent.